# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

CHRISTOPHER HOWE,          :

Individually, and on       :

Behalf of all others       :

Similarly situated,        :

      Plaintiff        :

   -vs-                    : CASE NO. 1:19-cv-01374

SPEEDWAY LLC AND           :

MARATHON PETROLEUM         :

COMPANY,                   :

     Defendants        :

_____

     Deposition of KELLI JONES, a witness
herein, taken by the Plaintiff as upon
cross-examination and pursuant to the Federal Rules
of Civil Procedure as to the time and place and
stipulations hereinafter set forth, at the offices
of Britton & Associates, 201 Riverside Drive, Suite
2B, Dayton, Ohio at 10:45 a.m., on October 1, 2019,
before Jamie S. Hurley, Court Reporter and Notary
Public within and for the State of Ohio.

       *   *   *   *   *   *

Electronically signed by Jamie Hurley (501-205-026-7923)          0398514a-fb93-424a-adab-0ac8606f2c22

Page 4

```
 1   WHEREUPON:

 2                    KELLI JONES,

 3   of lawful age, a witness herein, being first duly

 4   sworn as hereinafter certified, testified as

 5   follows:

 6                    CROSS-EXAMINATION

 7   BY MR. STEPHAN:

 8            Q.  Good morning.

 9            A.  Good morning.

10            Q.  Can you please state and spell your

11   name for the record?

12            A.  Kelli Jones, K-E-L-L-I, J-O-N-E-S.

13            Q.  Good morning, Kelli.  My name is Ryan

14   Stephan.  I'm one of the lawyers representing the

15   plaintiffs in the Howe versus Speedway case.  We're

16   here today to take your rule 30(b)(6) deposition in

17   that case.  Have you ever been deposed before?

18            A.  No.

19            Q.  Okay.  I'm going to go over a couple of

20   ground rules to try to follow just so that things

21   go smoothly, and we have a clear record, and

22   hopefully we get you out of here before too long.

23   Sound good?

24            A.  Sounds good.

25            Q.  First, is do your best to give clear
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 23

1    that in 2017.

2           Q.   Do you remember what time of the year

3    in 2017?

4           A.   Maybe around second to third quarter.

5           Q.   Do you remember what month of the year

6    it would have been?

7           A.   When we started evaluating the policy?

8           Q.   Yes.

9           A.   No, I don't know exactly what month

10   that was in.

11          Q.   How did you first learn that you were

12   going to evaluate the consent form policies for

13   Illinois workers regarding Speedway's finger scan

14   timekeeping device?

15          A.   There had been a news article related

16   to Kronos in particular that they were being looked

17   at for their finger scan devices, and that caused

18   our HR representatives and attorneys to come

19   together to just double check our compliance with

20   it.

21          Q.   Okay.  Do you remember who it was at

22   Speedway who identified that news article regarding

23   Kronos?

24          A.   I don't know who specifically noticed

25   the article.  I do know who was present in the

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 24

1    meeting.

2           Q.  Okay.  What meeting?

3           A.  To discuss the compliance and whether

4    we were where we needed to be.

5           Q.  Okay.  So the article would have been

6    before that meeting; is that correct?

7           A.  Yes.

8           Q.  Okay.  Was the article, did you ever

9    read the article?

10          A.  I did not read it verbatim.  I had kind

11   of hit some highlights on it.

12          Q.  Okay.  Do you know if the article was

13   for Kronos being sued for violations of the

14   Illinois Biometric Information Privacy Act?

15          A.  Yes.  That is correct.

16          Q.  So do you remember who shared that

17   article with you?

18          A.  I, nobody shared it with me.  I take it

19   upon myself if I hear of stuff like that to go and

20   search, so I'm sure I Googled it.

21          Q.  Okay.  Who first shared with you the

22   news that that article existed?

23          A.  That would have been our attorney.

24          Q.  Who was that?

25                  MR. WOLFE:  So I'm, I think

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 38

1    BY MR. STEPHAN:

2        Q.  No.  I just want to know when the next

3    conversation, not content of, just when the next --

4            MR. WOLFE:  Thank you, Ryan.

5            THE WITNESS:  Honestly, I don't

6    know specifically what the date was, but it would

7    have been sometime before November.

8    BY MR. STEPHAN:

9        Q.  Why do you say before November?

10       A.  Because we implemented the consent form

11   in November.

12       Q.  Do you know approximately how long

13   after that initial meeting that we discussed until

14   Holly created that consent form?

15       A.  A month or so.

16       Q.  Okay.  Do you know if anyone else

17   played a role in preparing the consent form?

18       A.  I mean, I don't know for sure, but I

19   would guess that Diana and her were creating it.

20       Q.  Can you think of anyone else that would

21   have helped prepare this consent form?

22       A.  IT may have had a role in that.

23       Q.  Would that have been either Chris

24   Salley or Ryan?

25       A.  Probably.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 45

1                    (WHEREUPON, a recess was taken.)

2    BY MR. STEPHAN:

3           Q.  We're back on the record.  When we took

4    a break we were talking about Speedway's rolling

5    out of this new BIPA consent form back in the fall

6    of 2017; do you recall that, Kelli?

7           A.  Yes.

8           Q.  And do you remember the date that it

9    was rolled out?

10          A.  I believe it was November 1st of 2017.

11          Q.  Okay.  And was Ms. Anderson responsible

12   for sort of overseeing the roll out to the store

13   employees in Illinois?

14          A.  Yes.

15          Q.  And I think you mentioned that it

16   applied for about 5 or 600 store employees at the

17   time; is that right?

18          A.  More or less.

19          Q.  Okay.  And they are all using

20   Speedway's timekeeping device at the time, correct?

21          A.  Yes.

22          Q.  And what type of device was it?

23          A.  It was a finger scan device.

24          Q.  Okay.  And do you know who the vendor

25   was that manufactured those devices?

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 46

```
 1          A.   I'm not aware of who manufactured the
 2     actual time devices, but the software was through
 3     Kronos.
 4          Q.   Do you know, do you know how Speedway
 5     obtained the hardware that is the physical devices
 6     themselves?
 7          A.   That would be through the vendor of
 8     Kronos.
 9          Q.   Okay.  So Speedway acquired both the
10     hardware, the devices themselves, and the software
11     to bundle those timekeeping devices from Kronos; is
12     that right?
13          A.   Yes.  At the time that software was
14     TimeLink, and Kronos acquired TimeLink.
15          Q.   When did Kronos acquire TimeLink?
16          A.   That I do not know.
17          Q.   Do you know if the time that these
18     consent forms being rolled out back in November of
19     2017, did Kronos own TimeLink at that time?
20          A.   Yes.
21          Q.   And Speedway used TimeLink prior to
22     Kronos purchasing it?
23          A.   Yes.
24          Q.   And who was the vendor before Kronos
25     then owned TimeLink?
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 47

1        A.  That was TimeLink.

2        Q.  Okay.  There's actually a company

3   called TimeLink, though, and TimeLink Software,

4   correct?

5        A.  Yes, at the time.

6        Q.  Do you know when Speedway first used

7   the TimeLink software?

8        A.  I believe that that was implemented

9   between 2003, 2004.

10       Q.  Does it still use it today?

11       A.  No.

12       Q.  When did it stop?

13       A.  Are you speaking specifically in the

14   State of Illinois?

15       Q.  Yes.

16       A.  2018.

17       Q.  Do you remember when in 2018?

18       A.  No, I don't because that was a phased

19   roll out in different divisions, went live at

20   different times throughout the year.

21       Q.  Okay.  So for the State of Illinois

22   would you agree that that software used for

23   timekeeping devices between 2003 or 2004 and then

24   2018 was TimeLink?

25       A.  Yes.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 48

1    Q.  Okay.  And TimeLink was previously

2    owned by the company TimeLink.  At some point it

3    implements in 2017, it was purchased by Kronos; is

4    that right?

5    A.  I don't know if it was 2017 it was

6    purchased by Kronos, but it was before we rolled

7    out the forms.

8    Q.  Okay.  Do you have any idea why Kronos

9    purchased TimeLink?

10    A.  I do not.

11    Q.  Okay.  And the devices themselves, the

12    hardware that we discussed about, they were

13    originally provided to Speedway by Kronos, correct?

14    A.  Yes.

15    Q.  Was there a name for those devices?

16    A.  I mean, they have a model name.  I

17    don't know what that model name is, but we just

18    called them the time clocks.

19    Q.  Do you know if they were ever called

20    Touch ID?

21    A.  I don't know that for sure.

22    Q.  Okay.  Would you agree that employees

23    working at Speedway stores in Illinois back in 2017

24    at the time of this rollout, consent form rollout

25    to clock in and out of these with their

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 55

1          Q.  Have we exhausted that basis?

2          A.  Yes.

3          Q.  Okay.  You also mentioned that another

4    basis of documentation, I think, from Kronos; is

5    that right?

6          A.  Yes.

7          Q.  What documentation are you referring

8    to?

9          A.  They have information, published

10   material about their specific software and hardware

11   devices that they use.

12         Q.  Can you think of the name of those

13   publications?

14         A.  No.

15         Q.  Do you remember when you first saw

16   those documents?

17         A.  No.

18         Q.  Okay.  Do you have any other basis for

19   your testimony that the timekeeping devices used by

20   Speedway don't take actual pictures of user's

21   fingerprints?

22         A.  No.

23         Q.  Okay.  You would agree, though, that at

24   least up until any changes that Kronos or, I'm

25   sorry, that Speedway made in 2018 that employees

Electronically signed by Jamie Hurley (501-205-026-7923)                                          0398514a-fb93-424a-adab-0ac8606f2c22

Page 56

1    would clock in and out by putting their finger on

2    the timekeeping device, correct?

3            A.  Yes.

4            Q.  And you would agree that before that

5    they could clock in and out they would have to be

6    enrolled in that timekeeping device, correct?

7            A.  Yes.

8            Q.  And to do so Speedway would collect

9    those user's fingerprints, correct?

10           A.  I would say that Speedway collected a

11   code that was assigned to a scan of match points of

12   an employee's finger.

13           Q.  Okay.  Let's break this down.  Have you

14   ever personally been involved in an enrollment of

15   an employee in Illinois into the timekeeping

16   device?

17           A.  No.

18           Q.  Do you have any personal knowledge

19   about how that occurs?

20           A.  Yes.

21           Q.  What is your personal knowledge?

22           A.  When an employee begins employment at

23   the store, the manager takes them to the clock.

24   The employee places their finger on the scanner.

25   That scanner immediately creates an alphanumeric

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

1   code that is assigned to that scan, and then that

2   is associated with the employee name, employee

3   number, and job.

4          Q.  By the way, any of those documents from

5   Kronos, did they actually use the word fingerprint?

6          A.  I do not know.

7          Q.  Have you ever seen any documents,

8   Speedway documents, Kronos documents or other

9   documents that say that timekeeping device collects

10  fingerprints?

11         A.  I do not recall that.

12         Q.  Do you know if the consent form that

13  that Speedway rolled out in November of 2017 uses

14  the word fingerprints?

15         A.  We use finger scan.

16         Q.  Are you sure about that?

17         A.  I can't specifically state if we used

18  the word fingerprint or not, but I know finger scan

19  is used repeatedly.

20         Q.  Okay.  If the consent form includes the

21  word fingerprint, would there be any problem with

22  that?

23             MR. WOLFE:  Object to the extent

24  it seeks a legal conclusion.  You can answer it.

25             THE WITNESS:  I don't know.

Electronically signed by Jamie Hurley (501-205-026-7923)                        0398514a-fb93-424a-adab-0ac8606f2c22

Page 58

1    BY MR. STEPHAN:

2          Q.  Okay.  So let's go back to this

3    process.  So the manager for new hires would take

4    the new employee for their timekeeping device,

5    correct?

6          A.  Yes.

7          Q.  The manager would have the employee

8    place a finger on the timekeeping device, correct?

9          A.  Yes.

10         Q.  And where on the device would they

11   place their finger?

12         A.  There's like a little pad on the side

13   of the clock (indicating).

14         Q.  Okay.  There is a glass pad?

15         A.  Honestly I don't know if it was glass.

16         Q.  Is there any scanner that's part of the

17   timekeeping device?

18         A.  The scanner is on the clock.

19         Q.  Okay.  So the employee, can the

20   employee put any finger he or she wants to on the

21   timekeeping scanner?

22         A.  Yes.

23         Q.  Okay.  Can they put the top of their

24   finger?

25         A.  Can you clarify?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 59

1          Q.  Yeah.  Can they put the top of their

2     finger, like their fingertips?

3          A.  I believe they could.  I'm not sure if

4     it could assign a code to that.

5          Q.  Is that consistent with Speedway's

6     process of enrolling new employees that are

7     permitted the top of their finger on the scanner

8     when they are rolling their fingerprint in the

9     timekeeping device; is that permitted?

10          A.  If it allows the employee to have the

11     scan completed and the code created, then we would

12     allow it.

13          Q.  Does it?

14          A.  Not to my knowledge.

15          Q.  Okay.  So they are required to place

16     the pad of their finger, correct?

17          A.  Yes.

18          Q.  Or where their fingerprint is, right?

19          A.  The pad of their finger, yes.

20          Q.  Yeah.  Would you agree with me, I mean,

21     it's not rocket science, the pad of your finger to

22     yours, that's where your fingerprint is, correct?

23          A.  Sure.

24          Q.  Okay.  And that's the part of your

25     finger that Speedway required store employees in

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 60

1    Illinois to scan when they are enrolled in a their

2    timekeeping system, correct?

3            A.  Normally.

4            Q.  What do you mean normally?

5            A.  I know of occasions where there's been

6    other images with match points that were converted

7    to this code that was outside of the finger.

8            Q.  What do you mean?

9            A.  There was a specific case that I had

10   talked to my manager about where employees no

11   longer had said fingerprint or pad on their finger,

12   and so we would collect the scan of the palm, a

13   point on the palm that would create match points to

14   that that would be able to create a code.

15           Q.  Okay.  So would you agree that outside

16   of those circumstances where an employee either

17   doesn't have a fingerprint or there's some problem

18   with their fingerprint that prevented them from

19   using that to enroll themselves into the

20   timekeeping device Speedway would have them use

21   their hand instead; is that correct?

22           A.  Or manually.

23           Q.  What do you mean manually?

24           A.  Employees, if they did not want to

25   provide the scan or if they couldn't provide a scan

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 65

1          A.   Those were provided by TimeLink at the

2     time.

3          Q.   Okay.   Was there a name for those

4     TimeLink timekeeping devices?

5          A.   There was, but I don't know what it

6     was.

7          Q.   Okay.   Were those TimeLink devices used

8     in stores in Illinois ever replaced?

9          A.   It is possible.

10         Q.   Do you know when?

11         A.   That would have been dependent on if

12    the clock would have broke or something, I mean,

13    they were never bulk replaced.

14         Q.   Okay.   Do you know if TimeLink, that

15    the devices originally, the timekeeping devices

16    originally provided by TimeLink are still used in

17    Speedway stores today?

18         A.   No, they are not.

19         Q.   Okay.   So at some point Speedway

20    stopped using the TimeLink for timekeeping devices,

21    correct?

22         A.   Yes.

23         Q.   When was that?

24         A.   2018.

25         Q.   Okay.   When in 2018?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 66

1          A.  I --

2               MR. WOLFE:  Is this different from

3    what we already covered?  I think --

4               MR. STEPHAN:  We haven't covered

5    this.

6               MR. WOLFE:  She already testified

7    about this, but go ahead.

8               THE WITNESS:  In 2018 we

9    implemented a new software, and that was a phased

10   rollout, so it would have been at any point in 2018

11   whenever that group of stores was set to rollout.

12   BY MR. STEPHAN:

13        Q.  Okay.  So 2018 you implemented this

14   software; is that correct?

15        A.  Yes.

16        Q.  And you replaced TimeLink software,

17   right?

18        A.  Yes.

19        Q.  With Kronos software; is that right?

20        A.  No.

21        Q.  Okay.  What kind of software?

22        A.  We replaced the software that we were

23   using of Kronos with Infor.

24        Q.  Infor?

25        A.  Infor, I-N-F-O-R.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 67

```
1              Q.  Okay.  Was Infor a separate method?

2              A.  Yes.

3              Q.  Is Infor the name of the method?

4              A.  Yes.

5              Q.  Okay.  So next is software.  Did

6    Speedway also change the hardware, timekeeping

7    hardware at stores in 2018?

8              A.  Yes.

9              Q.  Okay.  And the old hardware was what?

10             A.  The TimeLink hardware.

11             Q.  Okay.  Originally provided by TimeLink,

12   the TimeLink company, correct?

13             A.  Yes.

14             Q.  And what was it replaced with?

15             A.  The Infor partnered hardware.

16             Q.  So how many timekeeping devices were

17   replaced in 2018 in the State of Illinois?

18             A.  One.

19             Q.  I'm sorry, I'm trying to find out how

20   many physical devices were --

21             A.  Oh, I'm sorry.

22             Q.  -- were implemented in the Illinois

23   stores in 2018?

24             A.  As many stores as we would have had in

25   Illinois in 2018.
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 71

1   BY MR. STEPHAN:

2        Q.  Okay.  And that was true up until at

3   least November of 2017, correct?

4        A.  Yes.

5        Q.  Okay.  And during that time from 2012

6   until November of 2017 did Speedway get those

7   employees' written consent before it enrolled them

8   in the biometric timekeeping device?

9               MR. WOLFE:  Object to the extent

10  it seeks a legal conclusion.  You can answer it.

11              THE WITNESS:  There were numerous

12  policies that employees signed off on regarding our

13  technology, but specifically for the timekeeping

14  device, no.

15  BY MR. STEPHAN:

16       Q.  Okay.  And prior to November of 2017

17  did Speedway inform any of its store employees of

18  their rights under BIPA?

19              MR. WOLFE:  Same objection.  You

20  can answer it.

21              THE WITNESS:  I am not sure.

22  BY MR. STEPHAN:

23       Q.  As you sit here today are you aware of

24  under, informing store employees of their rights

25  under BIPA before November of 2017?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 72

1          A.  From a written perspective, no.  But
2     I'm not sure verbally.
3          Q.  Prior to November of 2017 are you aware
4     of Speedway having a written policy that was made
5     available to the public establishing a retention
6     schedule and guidelines for permanently destroying
7     biometric identifiers, biometric information?
8          A.  Speedway has a retention policy
9     regarding all timekeeping information.
10          Q.  Okay.  Do they have one regarding
11     people's fingerprints and how those fingerprints
12     were destroyed prior to November of 2017?
13          A.  Not specifically, but it was also not
14     excluded.
15          Q.  I'm sorry, it was also not?
16          A.  Excluded.
17          Q.  What policy are you referring to?
18          A.  Our records retention policy.
19          Q.  Is there a name for it?
20          A.  Timekeeping.
21          Q.  Where is that policy kept?
22          A.  It's in our operations manual available
23     for anyone to see.  It's also on our corporate
24     share drive.
25          Q.  Okay.  You say in the operation's

Electronically signed by Jamie Hurley (501-205-026-7923)          0398514a-fb93-424a-adab-0ac8606f2c22

Page 76

1    prepare for today's deposition?

2                    MR. WOLFE:  You can answer that

3    generally.

4                    THE WITNESS:  Policies.

5    BY MR. STEPHAN:

6            Q.  Anything else?

7            A.  Declarations.

8            Q.  Anything else?

9            A.  No.

10           Q.  What policies did you review?

11           A.  The code of conduct, the code of

12   business conduct, sorry, the personal and

13   employment information policy, the retention

14   policy, the information release policy and the

15   information system usage policy.

16           Q.  Okay.  Did you look at any other

17   policies?

18           A.  The BIPA policy that was created in

19   2017.

20           Q.  Okay.  Anything else?

21           A.  No.

22           Q.  Okay.  You also mentioned you looked at

23   declarations?

24           A.  Yes.

25           Q.  Whose declarations?

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 90

1   plus clocks installed; do you see that?

2          A.  Yes.

3          Q.  Okay.  And that was cross country; is

4   that right?

5          A.  Yes.

6          Q.  And I think we talked about this

7   earlier, but do you know how many were installed in

8   Illinois?

9          A.  Over 100.

10         Q.  Do you know if a, let me ask this

11  first.  Were you aware of store employees ever

12  going from working at one store and then going to

13  work at another store?

14         A.  Yes.

15         Q.  When that happens, can those employees

16  do that, go from store to store, do they have to

17  reenroll their fingerprint on the different

18  timekeeping devices, each store to clock in and

19  out?

20         A.  Yes.

21         Q.  Okay.  So if employees starts at store

22  A they are registered and enrolled in a timekeeping

23  device at store A before they can clock in and out

24  the timekeeping device at store B they have to

25  reenroll their fingerprint; is that right?

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 91

1        A.   Yes.



Electronically signed by Jamie Hurley (501-205-026-7923)          0398514a-fb93-424a-adab-0ac8606f2c22

Page 97

1   A. No.

2     MR. WOLFE:  So, Ryan, you know, I

3 mean, you can ask your questions to the extent they

4 were in the corporate rep notice, but this is a

5 document produced by Kronos that says Marathon

6 Petroleum Company on the cover.  She's Speedway's

7 Corporate Rep, and she's a Speedway employee.  So,

8 you know, I'll let you ask your questions, but

9 those are the things I'm thinking about as I look

10 at this.

11     MR. STEPHAN:  Sure.  Okay.  Jamie,

12 can you show Kelli what we marked as Exhibit 6

13 which will be Plaintiff's Exhibit 3 for purposes of

14 today's deposition?

15     (WHEREUPON, Plaintiff's Exhibit

16 No. 3 was marked for identification.)

17 BY MR. STEPHAN:



Electronically signed by Jamie Hurley (501-205-026-7923)

0398514a-fb93-424a-adab-0ac8606f2c22

Page 105



```
14              MR. STEPHAN:  Jamie, could you

15   show the witness what we have previously marked as

16   Exhibit 3 for you, it will be Plaintiff's Exhibit 4

17   for today?

18              (WHEREUPON, Plaintiff's Exhibit

19   No. 4 was marked for identification.)

20   BY MR. STEPHAN:

21        Q.  Kelli, are you familiar with Exhibit 3

22   which is Bates stamped SSPA00002299 through 301?

23        A.  Yes.

24        Q.  Could you tell us what it is?

25        A.  It is our BIPA consent form.
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 106

```
 1          Q.  Okay.

 2          A.  Or policy.

 3          Q.  Is this a form --

 4          A.  The BIPA policy.

 5          Q.  Sure.  Is this a form that's prepared

 6   by Holly and Diana?

 7          A.  Yes.

 8          Q.  Okay.  And this is a form that would

 9   have been rolled out on November 1st, 2017?

10          A.  Yes.

11          Q.  Okay.  Do you see at the top of it it

12   says, to all Illinois stores?

13          A.  Yes.

14          Q.  And this was actually rolled out to

15   over 100 stores in Illinois, correct?

16          A.  Yes.

17          Q.  By the way, have you ever read the

18   Illinois Biometric Information Privacy Act?

19          A.  No.

20          Q.  Do you know who if Diana or Holly had

21   approval from anyone else before they finalized the

22   policy?

23          A.  I'm sorry, can you repeat that.

24          Q.  Do you know if Holly Hollandsworth or

25   Diana Anderson needed to get approval from anyone
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 107

1    above her before they finalized this policy?

2              A.  No, I'm not aware.

3              Q.  Okay.  Do you see the very first

4    section that says, what information did Speedway

5    collect and why?

6              A.  Yes.

7              Q.  Do you see it says, during the

8    onboarding process Speedway uses a third party

9    device to scan employee's fingerprints?

10             A.  Yes.

11             Q.  It uses the word fingerprints, doesn't

12   it?

13             A.  Yes.

14             Q.  Just like the other Speedway documents

15   we've seen today?

16             A.  Yes.

17             Q.  By the way, at the time that this

18   document was being rolled out do you know if

19   Speedway had been sued for violations of BIPA?

20             A.  I am not sure.

21             Q.  You're aware that Christopher Howe

22   brought case against Speedway for violations of

23   BIPA?

24             A.  I'm aware of that because I'm here.

25             Q.  When did you first learn of that case?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 108

```
 1          A.  Honestly I'm not for sure, maybe at the
 2   end of 2017.
 3          Q.  Are you aware that Mr. Howe filed this
 4   lawsuit on February 1st, 2017?
 5          A.  No, I'm not aware.
 6          Q.  You would agree that would be two
 7   months before this consent form was rolled out?
 8          A.  Yes.
 9          Q.  Prior to rolling this consent form out
10   in November of 2017, did you have any knowledge
11   that a lawsuit was filed against Speedway for
12   violations of BIPA?
13          A.  No.
14          Q.  Do you remember how you first learned
15   about this lawsuit that brought you here today?
16          A.  I don't remember the specifics of the
17   conversation, but it was brought to my attention by
18   our attorney.
19          Q.  That would be Holly?
20          A.  That would be Holly, yes.
21          Q.  Was that face-to-face conversation?
22          A.  I don't recall.
23          Q.  In that first sentence it talks about
24   third party device; do you see that that, that
25   first bullet point?
```

Electronically signed by Jamie Hurley (501-205-026-7923)                           0398514a-fb93-424a-adab-0ac8606f2c22

Page 112

1    recall his name.

2         Q.  When was the last time you communicated

3    with Kostas?

4         A.  That would have probably been that

5    conversation that we had when he was onsite at

6    Speedway which was several years ago.

7         Q.  When was the last time you communicated

8    with the --

9         A.  That would have been after the

10   evaluation of time systems for the future, so 2017.

11        Q.  And who, was the rep a man or a woman?

12        A.  It was a man.

13        Q.  You don't remember his name?

14        A.  Honestly, I really don't, I'm sorry.

15        Q.  Would you agree that if we really want

16   to find out whether or not the original fingerprint

17   was to be recreated we should ask Kronos?

18        A.  Yeah.

19        Q.  Are you aware of any efforts by anyone

20   at Speedway to contest that statement?

21        A.  No, I'm not aware of that.

22        Q.  Okay.  And then do you see the next

23   section it talks about effective immediately?

24        A.  Yes.

25        Q.  So after November 1st, 2017 would you

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 113

1    agree it was Speedway's policy to require all

2    employees including store leadership hired on or

3    after November 2nd, 2007 to require them to

4    acknowledge and sign information release form

5    during the onboarding process?

6              A.  Yes.

7              Q.  Current employees who are already

8    enrolled who previously enrolled before November

9    1st, 2017 were also required to sign off on this

10   consent form, right?

11             A.  It does not specifically say in this

12   document they were required to sign it, but that,

13   they would need to acknowledge and sign to continue

14   to use it.

15             Q.  Right.  It doesn't use the word

16   require.  It says they need to acknowledge and sign

17   the release, correct?

18             A.  Correct.

19             Q.  It then goes on at the bottom it says,

20   if you have any questions, please dial the

21   Operations One Number; do you see that?

22             A.  Yes.

23             Q.  What is Operations One?

24             A.  The Operations One Number is one number

25   that all employees have access to for different

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 126

1   have with Matt Green about Speedway's biometric

2   timekeeping system?

3        A.  It's a regular topic of conversation

4   between us even today.

5        Q.  Okay.  Have you ever discussed whether

6   or not those biometric clocks were complying with

7   BIPA with Matt Green?

8        A.  Not specific to BIPA.  Outside of

9   sending this article and after we became aware of

10  the lawsuit we haven't really had conversation

11  outside of that, just as far as the compliance of

12  the time and attendance.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 134

```
 1   break?  Matt, I'm getting close to being done.
 2                   MR. WOLFE:  Okay.
 3                   MR. STEPHAN:  So let me just kind
 4   of take a look at my notes, take five minutes, and
 5   we'll come back and wrap up.
 6                   MR. WOLFE:  Okay.  Is that all
 7   right with you?
 8                   THE WITNESS:  Yeah, that's fine.
 9                   (WHEREUPON, a recess was taken.)
10   BY MR. STEPHAN:
11        Q.  Kelli, would you agree that Speedway
12   has used biometric clocks for purposes of employee
13   timekeeping?
14                   MR. WOLFE:  Same objection as
15   before as to the term biometric, but go ahead.
16                   THE WITNESS:  Yes.
17   BY MR. STEPHAN:
18        Q.  And is that why Speedway rolled out
19   this new consent in November of 2017?
20        A.  That is not why.  I think Speedway is
21   continuously evaluating policies, and we wanted to
22   make sure that, you know, we had a strong
23   compliance as we possibly could in all states.
24        Q.  Right.  So you would agree that
25   Speedway was doing its best to come into compliance
```

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 135

1    at least as of November 2017 with BIPA?

2            A.  I mean, it was my understanding that we

3    were already in compliance.  It was just a tool to

4    strengthen it.

5            Q.  Well, what was done to ensure

6    compliance before November of 2017?

7            A.  We keep our data secured.  We have

8    numerous policies addressing the privacy of

9    employee data and how we do not transmit that to

10   third party vendors, employees consent to

11   understanding that we treat our employee data and

12   customer data very, very securely.

13           Q.  Okay.  Are you aware of anything else

14   that was done by anyone at Speedway to ensure

15   compliance with BIPA prior to November of 2017?

16           A.  Not specific to BIPA.

17           Q.  And when you say that data was secured,

18   what data are you referring to?

19           A.  Any kind of personal information data.

20           Q.  Okay.  That would include biometric

21   data, correct?

22           A.  That would include the code that was

23   assigned to the employee.

24           Q.  Okay.  That would include the data that

25   was collected by Speedway's time clocks, correct?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 136

1          A.  Yes.

2          Q.  You also mentioned that there were

3    numerous policies that showed compliance, correct?

4          A.  Yes.

5          Q.  What policies are those?

6          A.  That would be like our code of conduct,

7    code of business conduct policy, our information

8    release policy, our personal and employment

9    information policy, retention policies, those types

10   of documents.

11         Q.  Did any of those policies you just

12   mentioned reference BIPA?

13         A.  Not specific.

14         Q.  Did any of those reference biometric

15   information systems?

16         A.  Not specifically.

17         Q.  Did any of those reference fingerprints

18   collected for purposes of timekeeping?

19         A.  Not specifically.

20         Q.  Okay.  The last thing I think you

21   mentioned was employee's consent, give consent; is

22   that right?

23         A.  Employee consent to understanding

24   Speedway's policy on information, yes.

25         Q.  So you're talking about general

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

Page 137

1    consent, correct?

2          A.  For the code of business conduct.

3          Q.  Okay.  Did they have to sign off on the

4    code of business conduct?

5          A.  Yes.

6          Q.  Okay.  And that code of business

7    conduct, correct me if I'm wrong, doesn't say

8    anything about BIPA, correct?

9          A.  Not specifically.

10         Q.  It doesn't say anything about

11   biometric, does it?

12         A.  Not specifically.

13         Q.  So the only consent that says anything

14   about fingerprints or biometric information, BIPA

15   is the one that was rolled out in November of 2017,

16   correct?

17         A.  Yes.

18         Q.  Do you know who Hannah Rice is?

19         A.  Hannah Rice, I have heard the name.  I

20   believe she was a district manager trainee a long

21   time ago.

22         Q.  Do you know if she's a communication

23   supervisor?

24         A.  She, you know now that you mention it,

25   she was a communication supervisor for a very, very

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22