# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3   CHRISTOPHER HOWE,            )
     individually and on behalf  )
 4   of all others similarly     )
     situated,                   )
 5                               )   Case No.
           Plaintiff,            )   1:19-cv-01374
 6                               )   Hon. Andrea R.
           vs.                   )   Wood
 7                               )   Magistrate
     SPEEDWAY LLC and MARATHON    )   Judge Hon.
 8   PETROLEUM COMPANY,          )   Susan E. Cox
                                 )
 9         Defendants.           )

10            The videotaped deposition of CHRISTOPHER

11   HOWE, called by the Defendant for examination,

12   pursuant to Notice, and pursuant to the Rules of

13   Civil Procedure for the United States District

14   Courts, taken before Renee E. Brass, CSR, RPR at

15   111 South Wacker Drive, 47th Floor, Chicago,

16   Illinois, on June 13, 2019, at the hour of

17   10:15 a.m.

18

19

20

21

22

23

24
```

1          MR. WOLFE:  Matt Wolfe for defendants,

2     Speedway LLC and Marathon Petroleum Company.

3          MR. FICZKO:  Andy Ficzko on behalf of

4     the plaintiffs.

5          THE VIDEOGRAPHER:  Thank you.  Please

6     proceed.

7                CHRISTOPHER HOWE,

8     having been first duly sworn, was examined and

9     testified as follows:

10                    EXAMINATION

11    BY MR. WOLFE:

12        Q.    Good morning, Mr. Howe.

13        A.    Good morning.

14        Q.    Could you state your name for the

15    record, please.

16        A.    Christopher Howe.

17        Q.    Where do you currently live?

18        ███    ██████████████

19        Q.    Can you give me the full address?

20        ███    ████████████████████████████████

21    ████████

22        Q.    Have you ever had your deposition taken

23    before?

24        A.    No, sir.

1      A.      Correct.

2      Q.      Okay.  And do you use the app to figure

3   out how much product you have to pick up?

4      A.      No.

5      Q.      So how do you determine that?

6      A.      Guesstimation.

7      Q.      Where did you work before Pugs?

8      A.      Speedway.

9      Q.      How long were you there?

10     A.      A year and six months maybe.  It

11   was September '16 to -- I'm sorry.  September '15

12   into May of '17.

13     Q.      I think you got that exactly right based

14   on the records I have seen.

15             So what was your position at Speedway?

16     A.      General manager.

17     Q.      Did you start as a general manager?

18     A.      Trainee.

19     Q.      Okay.  So you were hired as a manager

20   trainee?

21     A.      Correct.

22     Q.      And were you the general manager of a

23   particular store, like a particular Speedway

24   location?

 1        A.      Before or after?

 2        Q.      Well, that's -- that's a good question.

 3   Sorry that was unclear.

 4                So you started as a trainee?

 5        A.      Correct.

 6        Q.      And where were you -- where were you

 7   located then?

 8        A.      Glen Ellyn, Illinois.

 9        Q.      Okay.  And was there -- were you working

10   at a store location in Glen Ellyn?

11        A.      Yes.

12        Q.      And were you reporting to somebody at

13   that location like as a trainee?

14        A.      Correct.

15        Q.      Okay.  How long were you at the Glen

16   Ellyn location?

17        A.      Maybe a month.

18        Q.      Okay.  Can you describe generally what

19   the training consisted of in Glen Ellyn?

20        A.      Getting to know the register, food, how

21   to expire food, how to cook food, paperwork, daily

22   paperwork that was -- had to be done.

23        Q.      What kind of paperwork?

24        A.      As they would call it, end of day.

1      Q.     So what does that mean?

2      A.     You close-out the previous day and have

3   to enter in numbers to make sure that they married

4   up together.

5      Q.     By numbers, you mean like money numbers,

6   inventory?

7      A.     Sales numbers.

8      Q.     Sales numbers.  Okay.

9             After your month at Glen Ellyn, where

10  did you go next?

11     A.     Itasca.

12     Q.     And what was your position in Itasca?

13     A.     Same thing, trainee.

14     Q.     Okay.  And how long were you in Itasca?

15     A.     To October.

16     Q.     Was there anything different between

17  what your responsibilities were at Glen Ellyn and

18  Itasca?

19     A.     Yes.

20     Q.     What was different?

21     A.     He basically gave me the store to run as

22  I was an acting GM.

23     Q.     When you say "he," who do you mean?

24     A.     The GM of that store at the time.

1      Q.     Okay.  Was that -- do you remember his

2   name?

3      A.     Kevin.

4      Q.     Okay.  Was Kevin present as the GM?

5      A.     Yes.

6      Q.     But he was kind of stepping back,

7   letting you run the store as if you were the GM?

8      A.     Correct.

9      Q.     Then was the idea that you would

10   eventually like be the GM of your own store?

11      A.     Correct.

12      Q.     Okay.  Where did you go after Itasca?

13      A.     Addison.

14      Q.     And when was that?

15      A.     October.

16      Q.     Of '16?

17      A.     '16.

18      Q.     Okay.  And did you become the GM of the

19   Addison store?

20      A.     Yes, I did.

21      Q.     So what were your responsibilities as

22   the GM of the Addison store?

23      A.     Run the store like it was my own store.

24      Q.     Okay.  And was that subject to, you

1     A.     Yes.

2     Q.     Were you responsible for making sure

3   that employees clocked in and out at the beginning

4   and end of their shift?

5     A.     I'm sorry.  Can you rephrase that?

6     Q.     Yeah.  Were you responsible for making

7   sure that employees clocked in and out at the

8   beginning and end of their shift?

9     A.     No.

10     Q.     Who was responsible for that?

11     A.     The employee.

12     Q.     Okay.  Were you responsible for -- well,

13   let's -- we'll go -- we'll come back to

14   something -- something else later.

15            Why did you leave Speedway?

16     A.     I got fired.

17     Q.     How come?

18     A.     I filed a harassment charge against my

19   new supervisor and a week later he fired me.

20     Q.     Who was the supervisor?

21     A.     Umar.

22     Q.     What was the basis of the harassment

23   charge?

24     A.     He told me I had to do certain things,

1    and if I didn't do them, I would be punished.

2              He would yell, scream, and it was an

3    everyday thing that he would come to.  He would

4    bring up things that he didn't -- not know I guess,

5    heard and I would get yelled at, and then he told

6    me I had to do certain things certain ways, and it

7    was his rule and no one else needed to know about

8    it.

9         Q.    How long was Umar your supervisor?

10        A.    Month and a half I do believe.

11        Q.    So not the entire time you were at

12   Addison?

13        A.    No.

14        Q.    Okay.  Where did you file the harassment

15   charge?

16        A.    The 800 number they provide.

17        Q.    So you called the Speedway 1-800 number?

18   A 1-800 number that Speedway provided?

19        A.    Correct.

20        Q.    Okay.  What were the things that Umar

21   said you had to do that you did not want to do?

22        A.    Lie to vendors.

23        Q.    Give me an example.

24        A.    Tell them that we didn't get certain

1   product when we did get it, so we didn't -- so we

2   would get a credit.

3        Q.    Okay.  Anything else?

4        A.    There's other things, yes.

5        Q.    Can you tell me about them.

6        A.    You couldn't sell lottery at a certain

7   time.  You had to stop lottery sales at a certain

8   time and tell the employees -- or tell the

9   customers that it was a new rule.

10        Q.    Is it your understanding that what Umar

11   wanted you to do was not the way that the lottery

12   should actually be handled?

13        A.    It was a fact.

14        Q.    Okay.  What else?

15        A.    I had to sometimes work off the clock.

16        Q.    How often did that happen?

17        A.    What, that what happen?

18        Q.    How often did someone at Speedway

19   require you to work off the clock?

20        A.    As much as I could.

21        Q.    So I mean you said sometimes, so I --

22   what I'm trying to get at is did it happen once?

23   Did it happen daily?  Did it happen weekly?

24        A.    That I worked off the clock or that he

1  required?

2  Q.  Both.

3  A.  Almost weekly.

4  Q.  That Umar would tell you you have to be

5  working off the clock or that you would actually

6  work off the clock?

7  A.  That he would say it would be better to

8  work off the clock.

9  Q.  Okay.  And as a store GM, you clocked in

10  and out in order to get paid, right?

11  A.  Correct.

12  Q.  Using a time clock?

13  A.  Correct.

14  Q.  Okay.  Was your pay on an hourly basis?

15  A.  No.

16  Q.  You were paid salary?

17  A.  Correct.

18  Q.  But you had to clock in and out to show

19  the amount of hours you were on duty at the store?

20  A.  Correct.

21  Q.  Okay.  How often did you speak with

22  Umar?

23  A.  Almost daily.

24  Q.  In person or by phone or both?

1     A.     The biometric system.

2     Q.     Okay.  This -- so this form says -- it

3  looks to me to be a Speedway form.  Is that your

4  understanding as well?

5     A.     Correct.

6     Q.     Okay.  And it says form effective

7  November 1, 2017?

8     A.     Correct.

9     Q.     Were you working at Speedway on

10 November 1, 2017?

11    A.     No.

12    Q.     How did you get a copy of the form?

13    A.     My girlfriend.

14    Q.     Does she still work there?

15    A.     No.

16    Q.     Did she work there at that time?

17    A.     Yeah.

18    Q.     This is Athena, right?

19    A.     Correct.

20    Q.     Okay.  How did it come about that -- was

21 this form -- was this taken like as a photograph by

22 somebody?

23    A.     Yes.

24    Q.     Who took the photograph?

1     A.    Yes.

2     Q.    Can you explain?

3     A.    It means everyone that was in the same

4  situation I was at the time of this period.

5     Q.    By "same situation," do you mean clocked

6  in and out using one of the clocks in the photo

7  that we talked about?

8     A.    Yes.

9         MR. WOLFE:  Okay.  We have been going

10      about an hour.  Do you want to take a break

11      or do you want to keep going?

12         MR. FICZKO:  Use the restroom real

13      quick.

14         MR. WOLFE:  Sure.  Let's take a quick

15      break.

16         THE VIDEOGRAPHER:  Going off the

17      record at 11:13 a.m.

18            (A recess was had.)

19         THE VIDEOGRAPHER:  Back on the record

20      at 11:20 a.m.

21  BY MR. WOLFE:

22     Q.    Mr. Howe, could you go back to the

23  picture of the time clock that we were looking at.

24  It's the very last page of Exhibit 1.

1     A.    For me to punch in and out.

2     Q.    For you to get paid, right?

3     A.    Correct.

4     Q.    Okay.  And is that true for the other

5  employees who used it too?

6     A.    Correct.

7     Q.    Do you know based on your experience as

8  a general manager or otherwise at Speedway, was the

9  data from these clocks sent someplace else, like

10  could you see the data on another computer somehow?

11     A.    What data?

12     Q.    The punch-in-and-punch-out data.

13     A.    Yes.

14     Q.    How do you know?

15     A.    I would have to go to TimeLink if

16  someone forgot to punch out to punch them out.

17     Q.    Okay.  So as a store general manager,

18  you had access to TimeLink to correct bad punches,

19  enter a missing punch?

20     A.    Correct.

21     Q.    Okay.  What else could you do?

22     A.    That's it.

23     Q.    So you could edit punches?

24     A.    Yes.

1     Q.    If -- like if somebody -- so let's say

2  somebody forgot to punch in and they punched in

3  45 minutes late, could you change it to punch in at

4  the right time?

5     A.    Correct.

6     Q.    If somebody forgot to punch in or out

7  entirely, you could go in and edit to put in the

8  correct time?

9     A.    Correct.

10     Q.    Okay.  When you got new employees, did

11  somebody have to show them how to use the clocks?

12     A.    Yes.

13     Q.    Who?

14     A.    Myself.

15     Q.    So you showed the new employees how to

16  use the clocks?

17     A.    Correct.

18     Q.    Did you enroll them into the clock so

19  that they would have their employee ID associated

20  with their finger?

21     A.    Correct.

22     Q.    Do you remember how that worked?

23     A.    Yes and no.

24     Q.    Tell me what you remember about it.

1      Q.     But you did not take them?

2      A.     No.

3      Q.     Okay.  Besides the break feature, are

4   there any other features on the clock that you are

5   aware of that anyone at Speedway, you or the people

6   you supervised or anybody else would have used?

7      A.     No.

8      Q.     Okay.  What are you -- what are you

9   suing for in this case?

10      A.     I am suing for Speedway and Marathon to

11   abide by the law.

12      Q.     And the law that you want Speedway and

13   Marathon to abide by is the BIPA law?

14      A.     Correct.

15      Q.     You worked for Speedway, right?

16      A.     Correct.

17      Q.     Why did you sue Marathon Petroleum

18   Company?

19            MR. FICZKO:  Objection, seeks a legal

20       conclusion.

21   BY MR. WOLFE:

22      Q.     You can answer.

23      A.     Marathon owns Speedway.

24      Q.     So your understanding is Marathon

1     Q.   Is your -- are you saying by filing this

2  lawsuit that Speedway and Marathon didn't disclose

3  to you that the time clock was tracking your hours

4  by having you put your finger on it?

5        MR. FICZKO:  Objection, seeks a legal

6     conclusion.

7        THE WITNESS:  Correct.

8  BY MR. WOLFE:

9     Q.   But you put your finger on the clock

10  every day?

11     A.   It was required.

12     Q.   Different question.

13        My question is did you not understand

14  that when you put your finger on the clock every

15  day that it was relying on, you know, the ridges

16  and marks on your finger to identify you and track

17  your hours?

18     A.   Did I not understand that?

19     Q.   Yeah.

20     A.   No, I understood that.

21     Q.   And you continued to do it every day?

22     A.   It was required.

23     Q.   Is there something that you think

24  Speedway should have done differently that would

```
 1    have, you know, taken away the need for you to file

 2    the lawsuit?

 3              MR. FICZKO:  Objection, seeks a legal

 4        conclusion.

 5              THE WITNESS:  Yes.

 6    BY MR. WOLFE:

 7        Q.    What do you think Speedway should have

 8    done differently?

 9        A.    Told me what they were doing with my

10    personal information.

11        Q.    So that's -- I'm going to -- taking that

12    assumption, okay, let's say that Speedway should

13    have told you what they were doing with your

14    personal -- with your personal information.  Would

15    you have then done something differently?

16              MR. FICZKO:  Objection, hypothetical.

17              THE WITNESS:  If they would have told

18        me?

19    BY MR. WOLFE:

20        Q.    Yeah.

21        A.    No.

22        Q.    You wouldn't have quit?

23        A.    No.

24        Q.    You wouldn't have asked for more money?
```

1    A.    No.

2    Q.    No face recognition?

3    A.    No.

4    Q.    What kind of phone do you have?

5    A.    Galaxy Note 8.

6    Q.    Does that have a fingerprint feature to

7 unlock it?

8    A.    Maybe.

9    Q.    Do you use it?

10    A.    No.

11    Q.    How about face recognition?

12    A.    No.

13    Q.    You don't -- you don't use it?

14    A.    No.

15    Q.    Would you use it if it had it?

16    A.    Probably not.

17    Q.    The fingerprint, if you had a phone -- I

18 don't know if a Galaxy has it or not.

19        If -- if you had a phone that had the

20 fingerprint feature, would you use it?

21    A.    No.

22    Q.    Why not?

23    A.    Right now the unknowns.

24    Q.    Did you use a time clock when you worked

1    damages on behalf of all of these other class

2    members, might be thousands of people?

3          A.    Correct.

4          Q.    Are their damages the same as yours?

5                MR. FICZKO:  Objection, seeks a legal

6          conclusion.

7                THE WITNESS:  Yes.

8    BY MR. WOLFE:

9          Q.    And is that because the people in the

10   proposed class all used the clock in the same

11   manner you did?

12         A.    Yes.

13               MR. FICZKO:  Same objection.  Sorry.

14   BY MR. WOLFE:

15         Q.    When you applied to work at Speedway,

16   did you have to provide your Social Security

17   number?

18         A.    Yes.

19         Q.    Your birthday?

20         A.    Yes.

21         Q.    Your address?

22         A.    Yes.

23         Q.    To get paid by Speedway, you had to give

24   them your bank information, right?

 1    BY MR. WOLFE:

 2        Q.    Yeah.  Who would be in the class?  If

 3    the -- you know, the Court hasn't certified the

 4    class, but...

 5        A.    Myself.

 6        Q.    Uh-huh.

 7        A.    And every employee up until they

 8    released that paper.

 9        Q.    Up until they put a policy in place?

10        A.    Correct.

11        Q.    And when you say "they," you mean

12    Speedway?

13        A.    Speedway and Marathon.

14        Q.    Okay.  Do you know -- and your position

15    is that Speedway -- Marathon is being sued because

16    Marathon owns Speedway?

17            MR. FICZKO:  Objection, seeks a legal

18        conclusion.

19            THE WITNESS:  Yes.

20    BY MR. WOLFE:

21        Q.    Now, the class -- the class definition

22    in the complaint, it says:  All individuals who

23    worked for defendants in the State of Illinois who

24    had their fingerprints collected, captured,

1    Marathon or any facts supporting the idea that

2    Marathon collected, captured, received, otherwise

3    obtained or disclosed fingerprints?

4          MR. FICZKO:  Same objection, seeks a

5       legal conclusion.

6          THE WITNESS:  No.

7    BY MR. WOLFE:

8       Q.    There are gas stations out there branded

9    Marathon gas station, right?

10      A.    Correct.

11      Q.    Do you have -- do you have any knowledge

12   of what kind of timekeeping system they use?

13      A.    No.

14      Q.    The people who worked for you at

15   Addison, your employees, do you remember like what

16   their title was?  Is it associate, something like

17   that?

18      A.    I believe, yeah, just sales associate.

19      Q.    Okay.  So you -- you were, I think, a

20   store manager, and, like, a store manager trainee,

21   those were your positions there?

22      A.    Yes.  Started at -- they call it GMT,

23   store manage trainee, and then GM.

24      Q.    Okay.  So there's the GM.  There's, I

1    guess, there's GM trainees or whatever you want to

2    call it.  There's the associates.

3                Are there any other class of employee

4    that you know that would have used the clocks?

5         A.    Assistants.

6         Q.    So what's an assistant?

7         A.    Assistant store manager.

8         Q.    Okay.  Anybody else?

9         A.    Shift lead.

10        Q.    I imagine a shift lead is what it sounds

11   like?

12        A.    Correct.

13        Q.    So it's somebody who is not a manager,

14   but is like a leader of a certain shift?

15        A.    Correct.

16        Q.    Okay.  When the manager is not there?

17        A.    Or when the manager is there.

18        Q.    Okay.  Any other category of employees

19   that you can think of?

20        A.    Right now, no.  They've opened a couple

21   different things, so I don't know.

22        Q.    So your position is all those kinds of

23   employees all had to use these clocks so they all

24   should be in the class?

 1    employees can get paid?

 2         A.    Correct.

 3         Q.    Do you know one way or the other if

 4    every Speedway location in Illinois used a time

 5    clock like the one we talked about?

 6         A.    I know a lot of them did.

 7         Q.    And how do you know that?

 8         A.    Being in different stores.

 9         Q.    And specifically you would need to be in

10    the back -- back room at those stores to see the

11    clock, right?

12         A.    Correct.

13         Q.    About how many stores have you been in

14    the back room of in Illinois?

15         A.    Maybe seven-ish.

16         Q.    What's your fee arrangement with the

17    Stephan Zouras firm?

18         A.    I don't know.

19         Q.    Have you paid them anything?

20         A.    No.

21         Q.    Is it your understanding that they're

22    working on a contingency fee?

23         A.    Yes.

24         Q.    If you recover money or the class