# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

CHRISTOPHER HOWE,          :

Individually, and on       :

Behalf of all others       :

Similarly situated,        :

       Plaintiff          :

   -vs-                    : CASE NO. 1:19-cv-01374

SPEEDWAY LLC AND           :

MARATHON PETROLEUM         :

COMPANY,                   :

       Defendants         :

_____

       Deposition of KELLI JONES, a witness herein, taken by the Plaintiff as upon cross-examination and pursuant to the Federal Rules of Civil Procedure as to the time and place and stipulations hereinafter set forth, at the offices of Britton & Associates, 201 Riverside Drive, Suite 2B, Dayton, Ohio at 10:45 a.m., on October 1, 2019, before Jamie S. Hurley, Court Reporter and Notary Public within and for the State of Ohio.

       \*   \*   \*   \*   \*   \*

Electronically signed by Jamie Hurley (501-205-026-7923)　　　　0398514a-fb93-424a-adab-0ac8606f2c22

1  WHEREUPON:

2                 KELLI JONES,

3  of lawful age, a witness herein, being first duly

4  sworn as hereinafter certified, testified as

5  follows:

6              CROSS-EXAMINATION

7  BY MR. STEPHAN:

8      Q.  Good morning.

9      A.  Good morning.

10     Q.  Can you please state and spell your

11 name for the record?

12     A.  Kelli Jones, K-E-L-L-I, J-O-N-E-S.

13     Q.  Good morning, Kelli.  My name is Ryan

14 Stephan.  I'm one of the lawyers representing the

15 plaintiffs in the Howe versus Speedway case.  We're

16 here today to take your rule 30(b)(6) deposition in

17 that case.  Have you ever been deposed before?

18     A.  No.

19     Q.  Okay.  I'm going to go over a couple of

20 ground rules to try to follow just so that things

21 go smoothly, and we have a clear record, and

22 hopefully we get you out of here before too long.

23 Sound good?

24     A.  Sounds good.

25     Q.  First, is do your best to give clear

1  BY MR. STEPHAN:
2       Q.  No.  I just want to know when the next
3  conversation, not content of, just when the next --
4             MR. WOLFE:  Thank you, Ryan.
5             THE WITNESS:  Honestly, I don't
6  know specifically what the date was, but it would
7  have been sometime before November.
8  BY MR. STEPHAN:
9       Q.  Why do you say before November?
10      A.  Because we implemented the consent form
11  in November.
12      Q.  Do you know approximately how long
13  after that initial meeting that we discussed until
14  Holly created that consent form?
15      A.  A month or so.
16      Q.  Okay.  Do you know if anyone else
17  played a role in preparing the consent form?
18      A.  I mean, I don't know for sure, but I
19  would guess that Diana and her were creating it.
20      Q.  Can you think of anyone else that would
21  have helped prepare this consent form?
22      A.  IT may have had a role in that.
23      Q.  Would that have been either Chris
24  Salley or Ryan?
25      A.  Probably.

Electronically signed by Jamie Hurley (501-205-026-7923)    0398514a-fb93-424a-adab-0ac8606f2c22

```
                                                      Page 47
 1         A.   That was TimeLink.
 2         Q.   Okay.  There's actually a company
 3   called TimeLink, though, and TimeLink Software,
 4   correct?
 5         A.   Yes, at the time.
 6         Q.   Do you know when Speedway first used
 7   the TimeLink software?
 8         A.   I believe that that was implemented
 9   between 2003, 2004.
10         Q.   Does it still use it today?
11         A.   No.
12         Q.   When did it stop?
13         A.   Are you speaking specifically in the
14   State of Illinois?
15         Q.   Yes.
16         A.   2018.
17         Q.   Do you remember when in 2018?
18         A.   No, I don't because that was a phased
19   roll out in different divisions, went live at
20   different times throughout the year.
21         Q.   Okay.  So for the State of Illinois
22   would you agree that that software used for
23   timekeeping devices between 2003 or 2004 and then
24   2018 was TimeLink?
25         A.   Yes.
```

Electronically signed by Jamie Hurley (501-205-026-7923)                0398514a-fb93-424a-adab-0ac8606f2c22

1      Q. Okay. And TimeLink was previously
2 owned by the company TimeLink. At some point it
3 implements in 2017, it was purchased by Kronos; is
4 that right?
5      A. I don't know if it was 2017 it was
6 purchased by Kronos, but it was before we rolled
7 out the forms.
8      Q. Okay. Do you have any idea why Kronos
9 purchased TimeLink?
10      A. I do not.
11      Q. Okay. And the devices themselves, the
12 hardware that we discussed about, they were
13 originally provided to Speedway by Kronos, correct?
14      A. Yes.
15      Q. Was there a name for those devices?
16      A. I mean, they have a model name. I
17 don't know what that model name is, but we just
18 called them the time clocks.
19      Q. Do you know if they were ever called
20 Touch ID?
21      A. I don't know that for sure.
22      Q. Okay. Would you agree that employees
23 working at Speedway stores in Illinois back in 2017
24 at the time of this rollout, consent form rollout
25 to clock in and out of these with their

Electronically signed by Jamie Hurley (501-205-026-7923)    0398514a-fb93-424a-adab-0ac8606f2c22

1          Q.   Have we exhausted that basis?
2          A.   Yes.
3          Q.   Okay. You also mentioned that another
4 basis of documentation, I think, from Kronos; is
5 that right?
6          A.   Yes.
7          Q.   What documentation are you referring
8 to?
9          A.   They have information, published
10 material about their specific software and hardware
11 devices that they use.
12          Q.   Can you think of the name of those
13 publications?
14          A.   No.
15          Q.   Do you remember when you first saw
16 those documents?
17          A.   No.
18          Q.   Okay. Do you have any other basis for
19 your testimony that the timekeeping devices used by
20 Speedway don't take actual pictures of user's
21 fingerprints?
22          A.   No.
23          Q.   Okay. You would agree, though, that at
24 least up until any changes that Kronos or, I'm
25 sorry, that Speedway made in 2018 that employees

Electronically signed by Jamie Hurley (501-205-026-7923)    0398514a-fb93-424a-adab-0ac8606f2c22

1  would clock in and out by putting their finger on
2  the timekeeping device, correct?
3         A.  Yes.
4         Q.  And you would agree that before that
5  they could clock in and out they would have to be
6  enrolled in that timekeeping device, correct?
7         A.  Yes.
8         Q.  And to do so Speedway would collect
9  those user's fingerprints, correct?
10        A.  I would say that Speedway collected a
11 code that was assigned to a scan of match points of
12 an employee's finger.
13        Q.  Okay.  Let's break this down.  Have you
14 ever personally been involved in an enrollment of
15 an employee in Illinois into the timekeeping
16 device?
17        A.  No.
18        Q.  Do you have any personal knowledge
19 about how that occurs?
20        A.  Yes.
21        Q.  What is your personal knowledge?
22        A.  When an employee begins employment at
23 the store, the manager takes them to the clock.
24 The employee places their finger on the scanner.
25 That scanner immediately creates an alphanumeric

Electronically signed by Jamie Hurley (501-205-026-7923)                       0398514a-fb93-424a-adab-0ac8606f2c22

1  code was based on the employee's finger scan?
2     A.  Yes.
3     Q.  So before a code can be created, the
4  employee had to scan his or her finger on the
5  timekeeping device, correct?
6     A.  Yes.
7     Q.  And that code would then be used to
8  identify the users when they clock in and out on
9  Speedway's timekeeping device using their finger,
10 correct?
11    A.  Yes.
12    Q.  By the way, how long have the Kronos
13 devices been used by Speedway stores in Illinois?
14              MR. WOLFE:  Objection.  Asked and
15 answered.  You can answer it.
16              THE WITNESS:  The clocks have been
17 used since the original rollout in 2003, 2004.
18 BY MR. STEPHAN:
19    Q.  Have they always been Kronos time
20 clocks?
21              MR. WOLFE:  Objection, asked and
22 answered.  You can answer it again.
23              THE WITNESS:  Before Kronos bought
24 TimeLink, no, they were not.  They were not Kronos.
25 BY MR. STEPHAN:

Electronically signed by Jamie Hurley (501-205-026-7923)                0398514a-fb93-424a-adab-0ac8606f2c22

```
 1  BY MR. STEPHAN:
 2        Q.  Okay.  And that was true up until at
 3  least November of 2017, correct?
 4        A.  Yes.
 5        Q.  Okay.  And during that time from 2012
 6  until November of 2017 did Speedway get those
 7  employees' written consent before it enrolled them
 8  in the biometric timekeeping device?
 9              MR. WOLFE:  Object to the extent
10  it seeks a legal conclusion.  You can answer it.
11              THE WITNESS:  There were numerous
12  policies that employees signed off on regarding our
13  technology, but specifically for the timekeeping
14  device, no.
15  BY MR. STEPHAN:
16        Q.  Okay.  And prior to November of 2017
17  did Speedway inform any of its store employees of
18  their rights under BIPA?
19              MR. WOLFE:  Same objection.  You
20  can answer it.
21              THE WITNESS:  I am not sure.
22  BY MR. STEPHAN:
23        Q.  As you sit here today are you aware of
24  under, informing store employees of their rights
25  under BIPA before November of 2017?
```

Electronically signed by Jamie Hurley (501-205-026-7923)　　0398514a-fb93-424a-adab-0ac8606f2c22

1       A.   From a written perspective, no. But
2 I'm not sure verbally.
3       Q.   Prior to November of 2017 are you aware
4 of Speedway having a written policy that was made
5 available to the public establishing a retention
6 schedule and guidelines for permanently destroying
7 biometric identifiers, biometric information?
8       A.   Speedway has a retention policy
9 regarding all timekeeping information.
10      Q.   Okay. Do they have one regarding
11 people's fingerprints and how those fingerprints
12 were destroyed prior to November of 2017?
13      A.   Not specifically, but it was also not
14 excluded.
15      Q.   I'm sorry, it was also not?
16      A.   Excluded.
17      Q.   What policy are you referring to?
18      A.   Our records retention policy.
19      Q.   Is there a name for it?
20      A.   Timekeeping.
21      Q.   Where is that policy kept?
22      A.   It's in our operations manual available
23 for anyone to see. It's also on our corporate
24 share drive.
25      Q.   Okay. You say in the operation's

1  prepare for today's deposition?
2         MR. WOLFE: You can answer that
3  generally.
4         THE WITNESS: Policies.
5  BY MR. STEPHAN:
6     Q. Anything else?
7     A. Declarations.
8     Q. Anything else?
9     A. No.
10    Q. What policies did you review?
11    A. The code of conduct, the code of
12 business conduct, sorry, the personal and
13 employment information policy, the retention
14 policy, the information release policy and the
15 information system usage policy.
16    Q. Okay. Did you look at any other
17 policies?
18    A. The BIPA policy that was created in
19 2017.
20    Q. Okay. Anything else?
21    A. No.
22    Q. Okay. You also mentioned you looked at
23 declarations?
24    A. Yes.
25    Q. Whose declarations?

1      A. Honestly I'm not for sure, maybe at the
2 end of 2017.
3      Q. Are you aware that Mr. Howe filed this
4 lawsuit on February 1st, 2017?
5      A. No, I'm not aware.
6      Q. You would agree that would be two
7 months before this consent form was rolled out?
8      A. Yes.
9      Q. Prior to rolling this consent form out
10 in November of 2017, did you have any knowledge
11 that a lawsuit was filed against Speedway for
12 violations of BIPA?
13      A. No.
14      Q. Do you remember how you first learned
15 about this lawsuit that brought you here today?
16      A. I don't remember the specifics of the
17 conversation, but it was brought to my attention by
18 our attorney.
19      Q. That would be Holly?
20      A. That would be Holly, yes.
21      Q. Was that face-to-face conversation?
22      A. I don't recall.
23      Q. In that first sentence it talks about
24 third party device; do you see that that, that
25 first bullet point?

Electronically signed by Jamie Hurley (501-205-026-7923)     0398514a-fb93-424a-adab-0ac8606f2c22

1  recall his name.
2     Q.  When was the last time you communicated
3  with Kostas?
4     A.  That would have probably been that
5  conversation that we had when he was onsite at
6  Speedway which was several years ago.
7     Q.  When was the last time you communicated
8  with the --
9     A.  That would have been after the
10 evaluation of time systems for the future, so 2017.
11    Q.  And who, was the rep a man or a woman?
12    A.  It was a man.
13    Q.  You don't remember his name?
14    A.  Honestly, I really don't, I'm sorry.
15    Q.  Would you agree that if we really want
16 to find out whether or not the original fingerprint
17 was to be recreated we should ask Kronos?
18    A.  Yeah.
19    Q.  Are you aware of any efforts by anyone
20 at Speedway to contest that statement?
21    A.  No, I'm not aware of that.
22    Q.  Okay.  And then do you see the next
23 section it talks about effective immediately?
24    A.  Yes.
25    Q.  So after November 1st, 2017 would you

Electronically signed by Jamie Hurley (501-205-026-7923)                               0398514a-fb93-424a-adab-0ac8606f2c22

1 agree it was Speedway's policy to require all
2 employees including store leadership hired on or
3 after November 2nd, 2007 to require them to
4 acknowledge and sign information release form
5 during the onboarding process?
6     A.  Yes.
7     Q.  Current employees who are already
8 enrolled who previously enrolled before November
9 1st, 2017 were also required to sign off on this
10 consent form, right?
11     A.  It does not specifically say in this
12 document they were required to sign it, but that,
13 they would need to acknowledge and sign to continue
14 to use it.
15     Q.  Right.  It doesn't use the word
16 require.  It says they need to acknowledge and sign
17 the release, correct?
18     A.  Correct.
19     Q.  It then goes on at the bottom it says,
20 if you have any questions, please dial the
21 Operations One Number; do you see that?
22     A.  Yes.
23     Q.  What is Operations One?
24     A.  The Operations One Number is one number
25 that all employees have access to for different

1  at least as of November 2017 with BIPA?
2       A.  I mean, it was my understanding that we
3  were already in compliance.  It was just a tool to
4  strengthen it.
5       Q.  Well, what was done to ensure
6  compliance before November of 2017?
7       A.  We keep our data secured.  We have
8  numerous policies addressing the privacy of
9  employee data and how we do not transmit that to
10 third party vendors, employees consent to
11 understanding that we treat our employee data and
12 customer data very, very securely.
13      Q.  Okay.  Are you aware of anything else
14 that was done by anyone at Speedway to ensure
15 compliance with BIPA prior to November of 2017?
16      A.  Not specific to BIPA.
17      Q.  And when you say that data was secured,
18 what data are you referring to?
19      A.  Any kind of personal information data.
20      Q.  Okay.  That would include biometric
21 data, correct?
22      A.  That would include the code that was
23 assigned to the employee.
24      Q.  Okay.  That would include the data that
25 was collected by Speedway's time clocks, correct?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   A.   Yes.
2   Q.   You also mentioned that there were
3   numerous policies that showed compliance, correct?
4   A.   Yes.
5   Q.   What policies are those?
6   A.   That would be like our code of conduct,
7   code of business conduct policy, our information
8   release policy, our personal and employment
9   information policy, retention policies, those types
10  of documents.
11  Q.   Did any of those policies you just
12  mentioned reference BIPA?
13  A.   Not specific.
14  Q.   Did any of those reference biometric
15  information systems?
16  A.   Not specifically.
17  Q.   Did any of those reference fingerprints
18  collected for purposes of timekeeping?
19  A.   Not specifically.
20  Q.   Okay.  The last thing I think you
21  mentioned was employee's consent, give consent; is
22  that right?
23  A.   Employee consent to understanding
24  Speedway's policy on information, yes.
25  Q.   So you're talking about general

Electronically signed by Jamie Hurley (501-205-026-7923)    0398514a-fb93-424a-adab-0ac8606f2c22

```
 1   consent, correct?
 2          A.   For the code of business conduct.
 3          Q.   Okay.  Did they have to sign off on the
 4   code of business conduct?
 5          A.   Yes.
 6          Q.   Okay.  And that code of business
 7   conduct, correct me if I'm wrong, doesn't say
 8   anything about BIPA, correct?
 9          A.   Not specifically.
10          Q.   It doesn't say anything about
11   biometric, does it?
12          A.   Not specifically.
13          Q.   So the only consent that says anything
14   about fingerprints or biometric information, BIPA
15   is the one that was rolled out in November of 2017,
16   correct?
17          A.   Yes.
18          Q.   Do you know who Hannah Rice is?
19          A.   Hannah Rice, I have heard the name.  I
20   believe she was a district manager trainee a long
21   time ago.
22          Q.   Do you know if she's a communication
23   supervisor?
24          A.   She, you know now that you mention it,
25   she was a communication supervisor for a very, very
```

Electronically signed by Jamie Hurley (501-205-026-7923)   0398514a-fb93-424a-adab-0ac8606f2c22