# EXHIBIT 5

```
1           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   CHRISTOPHER HOWE,                )
    individually, and on behalf      )
4   of all others similarly          )
    situated,                        )
5                                    )
              Plaintiffs,             )
6                                    )
         vs.                         )   No. 1:19-cv-01374
7                                    )
    SPEEDWAY, LLC and MARATHON       )
8   PETROLEUM COMPANY,               )
                                     )
9             Defendants.            )

10

11          THE DEPOSITION OF NICOLE KARLSON, called

12   for examination pursuant to the Rules of Civil

13   Procedure for the United States District Courts

14   pertaining to the taking of depositions, taken before

15   Nohemi Salazar Pitts, Certified Shorthand Reporter for

16   the State of Illinois, on March 12, 2020, at the

17   Offices of StephanZouras, LLP, 100 North Riverside

18   Plaza, Suite 2150, Chicago, Illinois, commencing at

19   10:30 a.m.

20

21

22

23

24
```

**DEPOSITION OF NICOLE KARLSON**

```
 1                    (Whereupon, the witness was
 2                     administered an oath.)
 3                     NICOLE KARLSON,
 4   called as a witness herein, having been first
 5   administered an oath, was examined and testified as
 6   follows:
 7                        EXAMINATION
 8   BY MR. FICZKO:
 9        Q.    Good morning.
10        A.    Good morning.
11        Q.    If you could please state and spell your
12   full name for the record.
13        A.    Nicole Karlson, N-I-C-O-L-E K-A-R-L-S-O-N.
14        Q.    Do you mind if I call you "Nicole" today?
15        A.    That's fine.
16        Q.    Nicole, have you ever sat for a deposition
17   before?
18        A.    Not been the person, but I have sat in on
19   one.
20        Q.    Sat in on one?  Okay.
21              So you may be familiar with the process,
22   but what I want to do first is just go over some ground
23   rules.  As you can see, there's a court reporter here.
24   She can only take down verbal responses.  So if you
```

4

VerbalTech Inc. - 312.869.4039
Chicago, Illinois

1  not.

2      Q.    Okay.  Did Speedway take any additional

3  measures as a result of this 2017 e-mail that you

4  received?

5      A.    Can you elaborate, I guess --

6      Q.    Sure.  Were there -- in addition to the one

7  form that they included on the onboarding process, did

8  Speedway take any additional measures in an effort to

9  comply with BIPA?

10     A.    We collected consent from current employees.

11     Q.    Anything else?

12     A.    Not to my knowledge.

13     Q.    Okay.  You indicated that you -- or, excuse

14 me, Speedway, secured consents from current employees;

15 is that what you indicated?

16     A.    Written consents.

17     Q.    Is the consent form this additional form

18 that was being added on to the onboarding process?

19     A.    I don't recall.

20     Q.    Was there a consent form that individuals

21 needed to sign prior to 2017 regarding BIPA?

22     A.    Prior to that, it was general policies

23 relating to privacy and confidentiality during --

24     Q.    But was -- I'm sorry.

1    A.    During the onboarding program.

2    Q.    Sure.  But was there an actual written
3 consent form that was required to be signed?

4    A.    Not relating specifically to BIPA.

5    Q.    Okay.  Was there a consent form relating to
6 something else that they needed to sign on --

7    A.    The general privacy and confidentiality
8 policies.

9    Q.    Okay.

10    A.    And that would have been electronic.

11    Q.    And you indicated that current employees
12 needed to now sign this form, correct?

13    A.    The BIPA, specifically.

14    Q.    And would new hires also now need to sign
15 this consent form, BIPA consent form?

16    A.    That is now part of the onboarding process.
17 So all new hires would go through that during their
18 hire.

19    Q.    Got you.  Do you know who was responsible
20 for overseeing the rollout process?

21    A.    I do not.

22    Q.    And you may have answered this, but did you
23 have any involvement in the rollout process?

24    A.    I didn't.

1  the onboarding process?

2      A.    It has all the steps in place so that we

3  could hire a new employee.

4      Q.    Do you know if Speedway currently uses

5  timekeeping devices provided by Kronos?

6      A.    I don't know.

7      Q.    Do you know when Speedway first started

8  using TimeLink?

9      A.    I do not know.

10      Q.    Are you familiar with a Touch ID device?

11      A.    Not to my knowledge.

12      Q.    Would you agree that employees working at

13  Speedway stores in Illinois back in 2017, at the time

14  that the BIPA consent forms were being rolled out, that

15  they were required to clock in and clock out of these

16  timekeeping devices with their finger?

17      A.    Yes.

18      Q.    Do you know if the BIPA consent form that

19  was being rolled out in 2017 used the word

20  "fingerprint" in it?

21      A.    I do not know.

22      Q.    If the consent form did include the word

23  "fingerprint," would there be any issue with that, as

24  far as you are concerned?

1    Q.    What is your basis for your understanding
2 that the timekeeping devices only scanned the shape of
3 the finger?
4    A.    So in the information that was provided so
5 that we could educate employees if they had questions.
6    Q.    And what information are you referring to?
7    A.    In regards to the BIPA act.
8    Q.    So the basis of your knowledge that the
9 timekeeping devices only scanned the shape of the
10 finger is based on the information that was circulated
11 in 2017 regarding BIPA that we have been discussing
12 today?
13    A.    Correct.
14    Q.    Would you agree that at least up to the
15 time that Speedway rolled out the BIPA consent forms in
16 2017, that employees in Illinois would clock in and
17 clock out by putting their finger on the timekeeping
18 device?
19    A.    Can you re-ask the question?
20    Q.    Sure.  You want me to re-ask it; is that
21 what you're saying?
22    A.    Yes, please.
23    Q.    Would you agree that at least up until the
24 time that Speedway rolled out its BIPA consent form in

1  2017, that employees in Illinois would clock in and
2  clock out by putting their finger on the timekeeping
3  device?
4  　　　　A.　　Yes.
5  　　　　Q.　　And would you agree that after Speedway
6  rolled out the BIPA consent form in 2017, that
7  employees in Illinois would clock in and clock out by
8  putting their finger on the timekeeping device?
9  　　　　A.　　Yes.
10 　　　　Q.　　And would you agree that before they could
11 clock in and clock out, that a Speedway employee would
12 need to be enrolled in a timekeeping device?
13 　　　　A.　　Yes.
14 　　　　Q.　　And that was the case prior to the rollout
15 in 2017 of the BIPA consent form, correct?
16 　　　　A.　　Yes.
17 　　　　Q.　　And that was also the case after the 2017
18 rollout of the BIPA consent form, correct?
19 　　　　A.　　Yes.
20 　　　　Q.　　I believe you may have already answered
21 this.  Have you personally been involved in the
22 enrollment of an employee in Illinois into a
23 timekeeping device?
24 　　　　A.　　No.

1  Management?
2      A.   Not to my knowledge.
3      Q.   Do you know if Workforce Management is
4  Kronos?
5      A.   I believe they work together, but, again,
6  I'm not -- I don't know.
7      Q.   Sure.  Now, going back to the enrollment
8  process when you were a manager in Indiana, do you know
9  how the device collects an image?
10     A.   I do not.
11     Q.   If you wanted to ask somebody that question
12 to get an answer, who would you ask?
13     A.   I don't know.  I really don't know.
14     Q.   Are there any documents that you could look
15 at?
16     A.   Not to my knowledge.
17     Q.   Now, during the enrollment process, can an
18 individual put any finger he or she wants on the
19 timekeeping device?
20     A.   The old system, yes, they were able to do
21 so.  With this new system, I'm not sure.
22     Q.   In order to enroll when you were a store
23 manager, could an employee put the top of their finger
24 or their nail on the device to enroll?

1   Q. And where did you obtain that knowledge as
2   far as what part of the finger an employee should put
3   on the timekeeping device in order to enroll?
4   A. What I did on my own.
5   Q. And what do you mean what you did on your
6   own?
7   A. When I was hired into the company and I
8   myself logged myself in, in the space provided, common
9   sense says you put your finger on the pad.
10  Q. You weren't provided any instructions as
11  far as when to enroll --
12  A. Not to my recollection, no.
13  Q. Did anyone from TimeLink instruct you on
14  how to enroll an individual?
15  A. No.
16  Q. Could employees in Illinois refuse to use
17  their finger to clock in and out each day?
18  A. I never had it come up.
19  Q. When you were working as a manager in
20  Indiana, could an employee refuse to use their finger
21  to clock in and out?
22  A. Similar, I never had it come up.
23  Q. So when you were a manager, all of the
24  employees that you supervised used their finger to

1  clock in and out?
2      A.  They did.
3      Q.  Do you know, are new employees now able to
4  refuse to use their finger to clock in and out?
5      A.  Not to my knowledge.
6      Q.  So they're required to use their finger now
7  to clock in and out?
8      A.  Yes.
9      Q.  Do you know, today, currently, are all
10 timekeeping devices the same in all stores in Illinois?
11     A.  I do not know.
12     Q.  If you wanted to find that answer out, who
13 can you ask?
14     A.  I don't know.
15     Q.  Are there any documents that you could look
16 at?
17     A.  Not to my knowledge.
18     Q.  Are you familiar with Infor?
19     A.  No.
20     Q.  Since you have been working at Speedway,
21 has Speedway always had at least one timekeeping device
22 per store?
23     A.  To my knowledge.
24     Q.  Prior to the BIPA consent form being rolled

1  out in 2017, did Speedway get Illinois employees'
2  written consent before enrolling them in the time clock
3  devices?
4       A.    Not to my knowledge.
5       Q.    And prior to the rollout of the BIPA
6  consent forms in 2017, did Speedway inform any of its
7  Illinois store employees of their rights under BIPA?
8       A.    We would have general privacy and
9  confidentiality policies that they would have had
10 access to.
11      Q.    But as far as specifically related to BIPA,
12 prior to 2017, did Speedway inform its employees of
13 their rights under BIPA?
14      A.    Not under BIPA, to my knowledge.
15      Q.    Are you aware of Speedway having a written
16 policy that was made available to the public
17 establishing its retention schedule and destruction
18 guidelines for destroying biometric identifiers and/or
19 biometric information?
20      A.    Not to my knowledge.
21            MR. FICZKO:  Take a two-minute break?
22            MR. WOLFE:  Let's take five minutes.
23                  (Whereupon, a short break was
24                  taken.)

1     A.     Yes.

2     Q.     And you see where it says, ███ ███ ███
3  ████ ██ █ █ █████ █████ █ ██ ███
4  ██ ██ ██ ██ ██ ██ ██████

5     A.     Yes.

6     Q.     That one would also include employees in
7  Illinois, correct?

8     A.     I don't have any knowledge of it.

9     Q.     Any reason to believe that this would not
10 apply to employees in Illinois?

11    A.     No.

12    Q.     ███ ███ █ ██ █████ █ ██████
13 ████ ██████ ████████ ██ █ █ █
14 █████████ █ ██ ███████

15           Do you see that?

16    A.     I do.

17    Q.     ███ ███ █ █ █ █ █████████ █
18 █ ██ ████████ Do you see that too?

19    A.     I do.

20    Q.     ███ ███ █ █ █████ █ ██████ ██
21 █████ ██████ ██ █ ████████ █ █████ █ ████ █
22 ███████ █████████ ██ █ ███████ █████████ █
23 █████████ █ ██ █████████

24    A.     No.

1   A.   ████ ████ ████ ████ ███ ██████
2   Q.   And the pad is where the fingerprint is
3   located, correct?
4   A.   Yes.
5   Q.   ████ ████ █ ████████ ██████
6   A.   Sure.
7   Q.   ████ ████ ████ ████ ███ ███ ██████
8   ████████ █ █ █ █████
9   A.   Yes.
10  Q.   ███ █████ ████ █ ████ █ █ █
11  ████ ███ ████ █████ █ █ █ █ █████
12  A.   Yes.
13  Q.   █████ ████ ████ █████ █████ ██████ █
14  ████████ ███████ ██████████ ██████ █ ███████ █
15  ██ █████ ██ ████████ ████████
16  A.   Yes.
17  Q.   ██ █ █ ██████ ██ ██████
18  A.   I'm not sure.
19  Q.   Based on your reading of that, what is your
20  answer?
21  A.   █████ ████ ███ █ ████████ █ ██████
22       █ ███████ ██████ █████ █████ █████
23  ████ █ ██████ ██ █ █ █████ ████████
24  ██████ ██████ █████ █████ ██████ ██████ █████

1  ███ █ █ █ █ █ █ ███ █ ████
2  █ █ ██████ ████
3      A.    Yes.
4      Q.    Do you know if that's how the device
5  actually works?
6      A.    I do not know.
7      Q.    ███ █ █ █ █ █ █ █ █
8  ███ █ █ █ █ █ █ █ █ █
9  ██████
10     A.    Yes.
11     Q.    ███ █ █ █ █ █ █ █ ████
12 ███ █ ██████ ████ ████ ███ █ █
13 ███ ███ █ ██████ █ ██████ ██████
14 █ █ █ ████
15     A.    I do.
16     Q.    ███ █ █ █ █ █ ████ ███ █
17 ██████ ██████████
18     A.    I do not.
19     Q.    As you sit here today, what's your
20 definition of "biometric"?
21     A.    I don't know.  I have only used it in this
22 context.
23     Q.    And what do you mean in this context?
24     A.    For the BIPA information.

DEPOSITION OF NICOLE KARLSON

1  Q. And in this context, what is your
2  definition of "biometric"?
3  A. The finger scan information.
4  Q. And what information are you referring to?
5  A. The information gathered so that the
6  employee can punch in and punch out.
7  Q. And what information is gathered?
8  A. I'm not sure what information is gathered.
9  Q. And how does that relate to your definition
10 of biometric?
11 A. I guess it does not. I don't have a
12 specific definition of biometric.
13 Q. ████ ██ █████ █ ████ █
14 ██████ █ ███ ███ ████████
15 A. Yes.
16 Q. █ ████████ █ █ █ █ ███████
17 ████ ███ ███ ████████ █ ████████ █
18 ███████ ██████████████
19    Do you see that?
20 A. I do.
21 Q. Do you know what that sentence means?
22 A. I do not.
23 Q. ██ ███ ███████ █ ███████ █
24 ████████ ██ █ ███ ████████

1     Q.     Are you aware of anyone at Speedway making
2 any efforts to contest that statement?
3     A.     No.
4     Q.     ██████████████████████████████
5 ██████████████████████████████████████
6     A.     I do.
7     Q.     So after November 1, 2017, would you agree
8 that it was Speedway's policy to require all employees,
9 including store leadership, hired on or after
10 November 2nd, to acknowledge and sign the information
11 release form during the onboarding process?
12     A.     Yes.
13     Q.     And current employees who are already
14 enrolled before November 1st, 2017, were they also
15 required to sign off on the BIPA consent form?
16     A.     Yes.
17     Q.     ██████████████████████████████
18 ██████████████████████████████████████
19 ██████████████
20     A.     Yes.
21     Q.     ██████████████████████████████
22 ██████████████████████████████
23     A.     Yes.
24     Q.     And are you familiar with this policy?