# EXHIBIT 7

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF ILLINOIS

3

4   CHRISTOPHER HOWE,                  )
    Individually and on behalf         )
5   of all others similarly            )
    situated,                          )
6                                      )
              Plaintiffs,              )
7                                      )
         vs.                           ) No. 1:19-cv-01374
8                                      )
    SPEEDWAY LLC,                      )
9                                      )
              Defendant.               )
10

11

12        THE DEPOSITION OF MAREK MINTA, taken remotely

13   in the above-entitled cause via Zoom electronic

14   videoconferencing platform by Andrew R. Pitts,

15   Certified Shorthand Reporter of the State of Illinois,

16   on Thursday, September 23, 2021, pursuant to Notice at

17   the hour of 10:30 a.m. EDT.

18

19

20

21

22

23                       REPORTED BY:
                   ANDREW R. PITTS, CSR, RPR
24                   LICENSE NO.: 084-4575

```
 1                    MAREK MINTA,
 2   called as a witness herein, having been first
 3   administered an oath, was examined and testified
 4   remotely via videoconferencing as follows:
 5                      EXAMINATION
 6   BY MR. ZOURAS:
 7        Q.   Good morning, sir.  Can you hear me okay?
 8        A.   I can.
 9        Q.   Can you tell us your full name and spell
10   your last name for the record.
11        A.   My name is Marek Minta, spelled
12   M-I-N-T-A.
13        Q.   Mr. Minta, have you ever been deposed
14   before?
15        A.   I have not.
16        Q.   There's a few sort of ground rules we
17   have to go over to make this a smooth process.  As
18   you have been doing, you have to answer out loud.
19   That means you can't respond with things like shrugs
20   of the shoulder or nods of the head or any other
21   non-verbal response.
22             Please allow me to complete my question
23   before you attempt to answer it.  That is for the
24   sake of the court reporter who can only take down one
```

**VerbalTech Inc.**
312.869.4039
csrdirect.nsp@gmail.com

1 **mirror of that, BIPA is far more precise in talking**
2 **about face scan, but when it comes to the actual one**
3 **word of fingerprint, BIPA is grossly not precise.**
4     **Q.**    All right.
5     **A.**    **And that, in context -- in contrast to**
6 **its intent quoted. The intent is based on finger**
7 **scan solutions in public payment systems, from which**
8 **flows out the statute, whatever details, and then in**
9 **the contrast to that, imprecision of fingerprint.**
10     **Q.**    And in your opinion, what is imprecise
11 about the term fingerprint as used in the BIPA
12 statute?
13     **A.**    **The imprecision of that, that fingerprint**
14 **does not -- the meaning of fingerprint, the strict**
15 **meaning of fingerprint does not relate to the**
16 **regulated items that BIPA specifies, cannot relate to**
17 **those items, as defined by BIPA.**
18     **Q.**    Does the word fingerprint, if you know,
19 have a definition in BIPA?
20     **A.**    **It does not.**
21     **Q.**    So if it does not define the word
22 fingerprint, how could it be grossly imprecise, as
23 you testified?
24     **A.**    **Because it equates fingerprint to a**

1  **Q.**  Well, I'm not really asking you for your
2  opinion. I'm just asking you if you understood the
3  nature of the claim that was being made.
4  **A.  Oh, yeah. Yeah. Yeah. Yeah. Yeah.**
5  **Q.**  Okay.
6  **A.  Yes, I do.**
7  **Q.**  What was your -- yeah, what was your
8  understanding?
9  **A.  That it is a class action suit against**
10 **Speedway based on the violation of the BIPA statute.**
11 **Q.**  Before this time, had you ever heard of a
12 BIPA statute?
13 **A.  Yes, I had, in the course of my**
14 **employment at Authentec, but I didn't pay attention**
15 **to it then.**
16 **Q.**  Okay. So the first time you became aware
17 of the statute was when you were employed by
18 Authentec; is that correct?
19 **A.  In vague terms, but really for the deep**
20 **understanding, it's during the course of this case.**
21 **Q.**  Okay. Well, as far as even a vague
22 understanding of the statute, do you recall the
23 approximate time frame you would have first heard of
24 the BIPA statute?

1     **A.    I want to say around 2009 and '10 when**
2   **time clock manufacturers and access control people**
3   **started to be freaked out and the temperature of the**
4   **market went down, so our marketing and sales were**
5   **concerned that maybe adoption rate of the technology**
6   **will be slowed down, not just by BIPA, but also by**
7   **the EU regulatory things and privacy considerations.**
8     Q.    So can you identify any specific what you
9   call adopters who were freaked out, in your words, by
10   the BIPA statute?
11     **A.    No, not off the top of my head. I'd have**
12   **to go read through some e-mails. Perhaps it's there.**
13     Q.    Okay. So you first -- is it fair to say
14   you first heard of the BIPA statute because certain
15   adopters brought it to your attention?
16     **A.    It would have been more like salespeople**
17   **were worried that they will -- you know, in a company**
18   **like Authentec, there were sales segments, mobile**
19   **phones, PCs, access control. So the access control**
20   **sales guys were projecting difficulties in their**
21   **territory.**
22     Q.    Okay.
23     **A.    So that's how I would have experienced**
24   **it, not directly, but just hearing of it.**

1  did not receive certain materials, you believe you're
2  still able to render the opinions you have in this
3  case, correct?
4      **A.**    **As stated in my expert report.**
5      **Q.**    Okay.  Did you say you actually got the
6  devices themselves?
7      **A.**    **Yes, I did.**
8      **Q.**    Did you inspect the devices?
9      **A.**    **Yes, I did.**
10     **Q.**    How did you do that?
11     **A.**    **I opened them up.  I tried to use them as**
12 **a user.  I opened them up, I looked inside them, how**
13 **they are constructed to reach further conclusions**
14 **what were they capable of.**
15     **Q.**    Okay.  Before you inspected the devices,
16 did you have any opinions as to whether they were
17 collecting biometrics?
18     **A.**    **Well, yeah, when you have a biometrically**
19 **assistive device, it collects biometrics.**
20     **Q.**    And which specific devices did you
21 inspect?
22     **A.**    **I inspected the TimeLink punch clock and**
23 **two Kronos punch clocks and Synel punch clock, yeah.**
24     **Q.**    Okay.  These were separate devices, just

49

1     **A.**     **Correct.**

2     Q.     And that the feature extractor generates
3 an expressive representation called a feature set?

4     **A.**     **Correct.**

5     Q.     Okay. Do you agree that the enrollment
6 templates can also be called a reference?

7     **A.**     **Yeah.**

8     Q.     Fair?

9     **A.**     **Yes.**

10     Q.     Okay. Okay. Are you familiar with how a
11 enrollment template or reference is created?

12     **A.**     **Yes.**

13     Q.     Can you describe it?

14     **A.**     **Yes. So you have a sample with many**
15 **details, and that sample is processed by an algorithm**
16 **that is thought to decide how many unique elements as**
17 **governed by the type of the biometric algorithm. And**
18 **we can put an asterisk there and come back to that.**

19     **So there's a feature extractor that looks**
20 **for these unique things. I'm sure you've heard the**
21 **term of minutia, or there are other ways that are the**
22 **ridge flow patterns or angles. But let's say it's**
23 **minutia for simplification. All right?**

24     **So you present the sample that gets**

1  simplified, it's called process of binarization, and
2  then this algorithm goes through that thing, looks
3  for the unique points.  When it reaches the
4  acceptable number of these unique points, as
5  determined by the algorithm for this strength of --
6  required strength of a positive identification, it
7  basically stops.  It says, "I've heard enough unique
8  details.  I'm going to create a matrix of them in a
9  format that is going to be used."  There are many
10 formats for that, for the type of information.
11          And it's going to store it in a database
12 typically associated with some position number in the
13 database.  So let's say number 17.  All right?  So
14 I enroll my finger and that result, the template,
15 it's going to be in position number 17.
16      Q.   Do you agree that minutia are ridge
17 endings or bifurcations?
18      A.   Both, and there are other types.
19      Q.   Like what?
20      A.   There are islands.  I guess you could
21 make an island from two bifurcations and two endings.
22 So -- what else?  There's more than a bifurcation
23 where the ridges can split four ways.  There are
24 ridge thickness changes, so that would be like a

1 filled island. I don't remember what other types,
2 but I think there are several of them.
3     Q. Do you agree that minutia are
4 characteristics of a fingerprint?
5     A. **Yeah, minutia, as discovered -- when was**
6 **it? In France, right, late 19th Century, are the**
7 **most readily and simplistically understood as unique**
8 **identifiers of a pattern.**
9     Q. Is an enrollment template derived from a
10 fingerprint image?
11     A. **It can be derived from a fingerprint**
12 **image. It can be derived from a fingerprint image,**
13 **but it's not -- it's only possibility.**
14     Q. Okay. With respect to the devices you
15 inspected in this case, do you believe the template
16 was derived from a fingerprint image?
17     A. **I believe that it was not derived from a**
18 **fingerprint image.**
19     Q. What was it derived from?
20     A. **From the partial scan of human ridges,**
21 **which is not the same as fingerprint image.**
22     Q. And you've already told us why you
23 believe that, correct?
24     A. **Actually, we had not spoken in depth**

1                MR. ZOURAS:  Okay.
2      BY MR. ZOURAS:
3           **Q.**    Mr. Minta, when an employee first enrolls
4      their finger in the system, do you agree with me that
5      some data is collected?
6           **A.    Yes.**
7           **Q.**    What do you call that data?
8           **A.    A scan of human finger ridges in the case
9      of these clocks.**
10          **Q.**    Right.  That's all I'm asking.
11          **A.    Yeah.**
12          **Q.**    Okay.  So it's scan of human finger
13     ridges data; is that fair?
14          **A.    Fair.**
15          **Q.**    And when the employee later uses the
16     device to clock in or out, do you agree that data is
17     collected at that time?
18          **A.    Yes.**
19          **Q.**    And what is your term for that data?
20          **A.    It's the same data.**
21          **Q.**    Same data.  Okay.  Okay.  And is that
22     data stored anywhere?
23          **A.    No.**
24          **Q.**    So if the enrollment data is not stored,