# EXHIBIT 1

1        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3  CHRISTOPHER HOWE,        )
    individually and on behalf   )
4  of all others similarly     )
    situated,                )
5                     )  Case No.
        Plaintiff,       )  1:19-cv-01374
6                     )  Hon. Andrea R.
        vs.            )  Wood
7                     )  Magistrate
    SPEEDWAY LLC and MARATHON    )  Judge Hon.
8  PETROLEUM COMPANY,      )  Susan E. Cox
                     )
9        Defendants.      )

10        The videotaped deposition of CHRISTOPHER

11  HOWE, called by the Defendant for examination,

12  pursuant to Notice, and pursuant to the Rules of

13  Civil Procedure for the United States District

14  Courts, taken before Renee E. Brass, CSR, RPR at

15  111 South Wacker Drive, 47th Floor, Chicago,

16  Illinois, on June 13, 2019, at the hour of

17  10:15 a.m.

18

19

20

21

22

23

24

1    THE VIDEOGRAPHER:  This is David Dominiak

2  with Casale Reporting Services, Incorporated.  I

3  am the operator of this camera.

4         We are on the record on June 13, and

5  the time is 10:15 a.m. as indicated on the video

6  screen.

7         We are at 111 South Wacker Drive in

8  Chicago, Illinois.

9         This is the videotaped deposition of

10  Christopher Howe as being taken pursuant to

11  federal rules of civil procedure on behalf of the

12  defendants.

13         This case is captioned Christopher

14  Howe, individually, and on behalf of all others

15  similarly situated verse Speedway, LLC and

16  Marathon Petroleum Company, case number is

17  1:19-CV-01374.

18         The court reporter today is Renee Brass

19  with Casale Reporting Services.  She will now

20  please swear in the witness.

21              (Witness duly sworn.)

22    THE VIDEOGRAPHER:  Thank you.

23         Will the attorneys please identify

24    themselves for the video record.

1      A.     Correct.

2      Q.     Okay.  And do you use the app to figure

3  out how much product you have to pick up?

4      A.     No.

5      Q.     So how do you determine that?

6      A.     Guesstimation.

7      Q.     Where did you work before Pugs?

8      A.     Speedway.

9      Q.     How long were you there?

10     A.     A year and six months maybe.  It

11  was September '16 to -- I'm sorry.  September '15

12  into May of '17.

13     Q.     I think you got that exactly right based

14  on the records I have seen.

15            So what was your position at Speedway?

16     A.     General manager.

17     Q.     Did you start as a general manager?

18     A.     Trainee.

19     Q.     Okay.  So you were hired as a manager

20  trainee?

21     A.     Correct.

22     Q.     And were you the general manager of a

23  particular store, like a particular Speedway

24  location?

1        A.     Before or after?

2        Q.     Well, that's -- that's a good question.

3   Sorry that was unclear.

4               So you started as a trainee?

5        A.     Correct.

6        Q.     And where were you -- where were you

7   located then?

8        A.     Glen Ellyn, Illinois.

9        Q.     Okay.  And was there -- were you working

10  at a store location in Glen Ellyn?

11       A.     Yes.

12       Q.     And were you reporting to somebody at

13  that location like as a trainee?

14       A.     Correct.

15       Q.     Okay.  How long were you at the Glen

16  Ellyn location?

17       A.     Maybe a month.

18       Q.     Okay.  Can you describe generally what

19  the training consisted of in Glen Ellyn?

20       A.     Getting to know the register, food, how

21  to expire food, how to cook food, paperwork, daily

22  paperwork that was -- had to be done.

23       Q.     What kind of paperwork?

24       A.     As they would call it, end of day.

1    Q.    So what does that mean?

2    A.    You close-out the previous day and have

3  to enter in numbers to make sure that they married

4  up together.

5    Q.    By numbers, you mean like money numbers,

6  inventory?

7    A.    Sales numbers.

8    Q.    Sales numbers.  Okay.

9            After your month at Glen Ellyn, where

10  did you go next?

11    A.    Itasca.

12    Q.    And what was your position in Itasca?

13    A.    Same thing, trainee.

14    Q.    Okay.  And how long were you in Itasca?

15    A.    To October.

16    Q.    Was there anything different between

17  what your responsibilities were at Glen Ellyn and

18  Itasca?

19    A.    Yes.

20    Q.    What was different?

21    A.    He basically gave me the store to run as

22  I was an acting GM.

23    Q.    When you say "he," who do you mean?

24    A.    The GM of that store at the time.

1     Q.     Okay.  Was that -- do you remember his

2     name?

3     A.     Kevin.

4     Q.     Okay.  Was Kevin present as the GM?

5     A.     Yes.

6     Q.     But he was kind of stepping back,

7     letting you run the store as if you were the GM?

8     A.     Correct.

9     Q.     Then was the idea that you would

10     eventually like be the GM of your own store?

11     A.     Correct.

12     Q.     Okay.  Where did you go after Itasca?

13     A.     Addison.

14     Q.     And when was that?

15     A.     October.

16     Q.     Of '16?

17     A.     '16.

18     Q.     Okay.  And did you become the GM of the

19     Addison store?

20     A.     Yes, I did.

21     Q.     So what were your responsibilities as

22     the GM of the Addison store?

23     A.     Run the store like it was my own store.

24     Q.     Okay.  And was that subject to, you

1    A.    The biometric system.

2    Q.    Okay.  This -- so this form says -- it

3  looks to me to be a Speedway form.  Is that your

4  understanding as well?

5    A.    Correct.

6    Q.    Okay.  And it says form effective

7  November 1, 2017?

8    A.    Correct.

9    Q.    Were you working at Speedway on

10  November 1, 2017?

11    A.    No.

12    Q.    How did you get a copy of the form?

13    A.    My girlfriend.

14    Q.    Does she still work there?

15    A.    No.

16    Q.    Did she work there at that time?

17    A.    Yeah.

18    Q.    This is Athena, right?

19    A.    Correct.

20    Q.    Okay.  How did it come about that -- was

21  this form -- was this taken like as a photograph by

22  somebody?

23    A.    Yes.

24    Q.    Who took the photograph?

 1    what this photograph is of?

 2         A.    The how you have to punch in and out.

 3         Q.    Okay.  Do you know where this picture

 4    was taken?

 5         A.    I don't remember.

 6         Q.    Do you know who took it?

 7         A.    I don't remember.

 8         Q.    Did you take it?

 9         A.    I believe not.

10         Q.    Did Athena take it?

11         A.    That one I'm unsure of.

12         Q.    Does this look like the clock that you

13    used to punch in and out when you worked at

14    Speedway?

15         A.    Yes.

16         Q.    Did you use a clock like this at every

17    location you worked at?

18         A.    Yes.

19         Q.    And you used a clock like this to punch

20    in and out every day at every location you worked

21    at?

22         A.    Yes.

23         Q.    Look -- just looking at the picture, I

24    understand that you are not sure where -- where it

1        A.    Yes.

2        Q.    Can you explain?

3        A.    It means everyone that was in the same

4    situation I was at the time of this period.

5        Q.    By "same situation," do you mean clocked

6    in and out using one of the clocks in the photo

7    that we talked about?

8        A.    Yes.

9            MR. WOLFE:  Okay.  We have been going

10        about an hour.  Do you want to take a break

11        or do you want to keep going?

12            MR. FICZKO:  Use the restroom real

13        quick.

14            MR. WOLFE:  Sure.  Let's take a quick

15        break.

16            THE VIDEOGRAPHER:  Going off the

17        record at 11:13 a.m.

18                (A recess was had.)

19            THE VIDEOGRAPHER:  Back on the record

20        at 11:20 a.m.

21    BY MR. WOLFE:

22        Q.    Mr. Howe, could you go back to the

23    picture of the time clock that we were looking at.

24    It's the very last page of Exhibit 1.

1    Q.   If -- like if somebody -- so let's say

2  somebody forgot to punch in and they punched in

3  45 minutes late, could you change it to punch in at

4  the right time?

5    A.   Correct.

6    Q.   If somebody forgot to punch in or out

7  entirely, you could go in and edit to put in the

8  correct time?

9    A.   Correct.

10    Q.   Okay.  When you got new employees, did

11  somebody have to show them how to use the clocks?

12    A.   Yes.

13    Q.   Who?

14    A.   Myself.

15    Q.   So you showed the new employees how to

16  use the clocks?

17    A.   Correct.

18    Q.   Did you enroll them into the clock so

19  that they would have their employee ID associated

20  with their finger?

21    A.   Correct.

22    Q.   Do you remember how that worked?

23    A.   Yes and no.

24    Q.   Tell me what you remember about it.

1    A.    I believe I would have to hit F1 and

2  that would be -- that would bring up a screen of

3  different things you could do.  You would have to

4  hit a certain number to do new enrollment, type in

5  their employee number, and then when you hit the

6  checkmark, it would ask you to put down your left

7  index finger, and if you didn't have it on there

8  tight enough, it would tell you to put it -- push

9  down harder.  Tell you to lift it up, tell you to

10  put it down three times.  Then it would ask you to

11  do your right index finger, same thing, and then

12  now -- and then it would say you are now stored.

13    Q.    And then once that information was

14  stored, could the employee clock in and out simply

15  by putting their finger on the clock?

16    A.    Correct.

17    Q.    Let's look at this.  This is going to be

18  Exhibit 3.

19              (Exhibit 3 marked for

20              identification.)

21  BY MR. WOLFE:

22    Q.    So this is a Speedway TimeLink.  Do you

23  remember ever seeing a document or a document like

24  that before?

1      Q.      Is your -- are you saying by filing this

2   lawsuit that Speedway and Marathon didn't disclose

3   to you that the time clock was tracking your hours

4   by having you put your finger on it?

5          MR. FICZKO:  Objection, seeks a legal

6      conclusion.

7          THE WITNESS:  Correct.

8   BY MR. WOLFE:

9      Q.      But you put your finger on the clock

10  every day?

11     A.      It was required.

12     Q.      Different question.

13          My question is did you not understand

14  that when you put your finger on the clock every

15  day that it was relying on, you know, the ridges

16  and marks on your finger to identify you and track

17  your hours?

18     A.      Did I not understand that?

19     Q.      Yeah.

20     A.      No, I understood that.

21     Q.      And you continued to do it every day?

22     A.      It was required.

23     Q.      Is there something that you think

24  Speedway should have done differently that would

1  have, you know, taken away the need for you to file

2  the lawsuit?

3          MR. FICZKO:  Objection, seeks a legal

4    conclusion.

5          THE WITNESS:  Yes.

6  BY MR. WOLFE:

7    Q.    What do you think Speedway should have

8  done differently?

9    A.    Told me what they were doing with my

10  personal information.

11    Q.    So that's -- I'm going to -- taking that

12  assumption, okay, let's say that Speedway should

13  have told you what they were doing with your

14  personal -- with your personal information.  Would

15  you have then done something differently?

16          MR. FICZKO:  Objection, hypothetical.

17          THE WITNESS:  If they would have told

18    me?

19  BY MR. WOLFE:

20    Q.    Yeah.

21    A.    No.

22    Q.    You wouldn't have quit?

23    A.    No.

24    Q.    You wouldn't have asked for more money?

1    damages on behalf of all of these other class

2    members, might be thousands of people?

3        A.    Correct.

4        Q.    Are their damages the same as yours?

5              MR. FICZKO:  Objection, seeks a legal

6        conclusion.

7              THE WITNESS:  Yes.

8    BY MR. WOLFE:

9        Q.    And is that because the people in the

10   proposed class all used the clock in the same

11   manner you did?

12       A.    Yes.

13             MR. FICZKO:  Same objection.  Sorry.

14   BY MR. WOLFE:

15       Q.    When you applied to work at Speedway,

16   did you have to provide your Social Security

17   number?

18       A.    Yes.

19       Q.    Your birthday?

20       A.    Yes.

21       Q.    Your address?

22       A.    Yes.

23       Q.    To get paid by Speedway, you had to give

24   them your bank information, right?

    1    BY MR. WOLFE:

    2        Q.    Yeah.  Who would be in the class?  If

    3    the -- you know, the Court hasn't certified the

    4    class, but...

    5        A.    Myself.

    6        Q.    Uh-huh.

    7        A.    And every employee up until they

    8    released that paper.

    9        Q.    Up until they put a policy in place?

   10        A.    Correct.

   11        Q.    And when you say "they," you mean

   12    Speedway?

   13        A.    Speedway and Marathon.

   14        Q.    Okay.  Do you know -- and your position

   15    is that Speedway -- Marathon is being sued because

   16    Marathon owns Speedway?

   17             MR. FICZKO:  Objection, seeks a legal

   18        conclusion.

   19             THE WITNESS:  Yes.

   20    BY MR. WOLFE:

   21        Q.    Now, the class -- the class definition

   22    in the complaint, it says:  All individuals who

   23    worked for defendants in the State of Illinois who

   24    had their fingerprints collected, captured,

1    Marathon or any facts supporting the idea that

2    Marathon collected, captured, received, otherwise

3    obtained or disclosed fingerprints?

4              MR. FICZKO:  Same objection, seeks a

5         legal conclusion.

6              THE WITNESS:  No.

7    BY MR. WOLFE:

8         Q.    There are gas stations out there branded

9    Marathon gas station, right?

10        A.    Correct.

11        Q.    Do you have -- do you have any knowledge

12   of what kind of timekeeping system they use?

13        A.    No.

14        Q.    The people who worked for you at

15   Addison, your employees, do you remember like what

16   their title was?  Is it associate, something like

17   that?

18        A.    I believe, yeah, just sales associate.

19        Q.    Okay.  So you -- you were, I think, a

20   store manager, and, like, a store manager trainee,

21   those were your positions there?

22        A.    Yes.  Started at -- they call it GMT,

23   store manage trainee, and then GM.

24        Q.    Okay.  So there's the GM.  There's, I

1    guess, there's GM trainees or whatever you want to

2    call it.  There's the associates.

3              Are there any other class of employee

4    that you know that would have used the clocks?

5         A.    Assistants.

6         Q.    So what's an assistant?

7         A.    Assistant store manager.

8         Q.    Okay.  Anybody else?

9         A.    Shift lead.

10         Q.    I imagine a shift lead is what it sounds

11    like?

12         A.    Correct.

13         Q.    So it's somebody who is not a manager,

14    but is like a leader of a certain shift?

15         A.    Correct.

16         Q.    Okay.  When the manager is not there?

17         A.    Or when the manager is there.

18         Q.    Okay.  Any other category of employees

19    that you can think of?

20         A.    Right now, no.  They've opened a couple

21    different things, so I don't know.

22         Q.    So your position is all those kinds of

23    employees all had to use these clocks so they all

24    should be in the class?

1    employees can get paid?

2          A.    Correct.

3          Q.    Do you know one way or the other if

4    every Speedway location in Illinois used a time

5    clock like the one we talked about?

6          A.    I know a lot of them did.

7          Q.    And how do you know that?

8          A.    Being in different stores.

9          Q.    And specifically you would need to be in

10   the back -- back room at those stores to see the

11   clock, right?

12         A.    Correct.

13         Q.    About how many stores have you been in

14   the back room of in Illinois?

15         A.    Maybe seven-ish.

16         Q.    What's your fee arrangement with the

17   Stephan Zouras firm?

18         A.    I don't know.

19         Q.    Have you paid them anything?

20         A.    No.

21         Q.    Is it your understanding that they're

22   working on a contingency fee?

23         A.    Yes.

24         Q.    If you recover money or the class