# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

CHRISTOPHER HOWE,          :

Individually, and on      :

Behalf of all others      :

Similarly situated,       :

     Plaintiff         :

  -vs-                    : CASE NO. 1:19-cv-01374

SPEEDWAY LLC AND          :

MARATHON PETROLEUM        :

COMPANY,                  :

     Defendants        :

_____

Deposition of KELLI JONES, a witness
herein, taken by the Plaintiff as upon
cross-examination and pursuant to the Federal Rules
of Civil Procedure as to the time and place and
stipulations hereinafter set forth, at the offices
of Britton & Associates, 201 Riverside Drive, Suite
2B, Dayton, Ohio at 10:45 a.m., on October 1, 2019,
before Jamie S. Hurley, Court Reporter and Notary
Public within and for the State of Ohio.

*    *    *    *    *    *

Electronically signed by Jamie Hurley (501-205-026-7923)                                   0398514a-fb93-424a-adab-0ac8606f2c22

1   WHEREUPON:

2                     KELLI JONES,

3   of lawful age, a witness herein, being first duly

4   sworn as hereinafter certified, testified as

5   follows:

6                     CROSS-EXAMINATION

7   BY MR. STEPHAN:

8          Q.  Good morning.

9          A.  Good morning.

10          Q.  Can you please state and spell your

11  name for the record?

12          A.  Kelli Jones, K-E-L-L-I, J-O-N-E-S.

13          Q.  Good morning, Kelli.  My name is Ryan

14  Stephan.  I'm one of the lawyers representing the

15  plaintiffs in the Howe versus Speedway case.  We're

16  here today to take your rule 30(b)(6) deposition in

17  that case.  Have you ever been deposed before?

18          A.  No.

19          Q.  Okay.  I'm going to go over a couple of

20  ground rules to try to follow just so that things

21  go smoothly, and we have a clear record, and

22  hopefully we get you out of here before too long.

23  Sound good?

24          A.  Sounds good.

25          Q.  First, is do your best to give clear

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

1    supporting our HR systems.

2         Q.  Okay.  So is it safe to a say that you

3    added the department within Speedway, the

4    department was an HRIS department?

5         A.  That is correct.

6         Q.  Okay.  And that was in 2016?

7         A.  Yes.

8         Q.  Okay.  And how long did you work as

9    supervisor personnel administration in HRIS?

10         A.  A year and a half.

11         Q.  Okay.  What was your next position?

12         A.  I assumed another department that was

13    already in existence, and I became the manager of

14    HRIS, payroll, and personnel administration.

15         Q.  Okay.  You were manager of --

16         A.  HRIS --

17         Q.  Yeah.

18         A.  -- payroll, and personnel

19    administration.

20         Q.  Okay.  And how long did you hold that

21    position?

22         A.  I'm still in it.

23         Q.  So you've been in that position since

24    2017?

25         A.  January 1 of 2018.

Electronically signed by Jamie Hurley (501-205-026-7923)                0398514a-fb93-424a-adab-0ac8606f2c22

1    charge of processing hire to termination, so any

2    employee movement, any minimum wage changes, et

3    cetera.

4            Q.   Okay.   Currently do you play any role

5    in creating the Speedway policies?

6            A.   To a certain extent.

7            Q.   Can you tell us what your involvement

8    is?

9            A.   So we handle researching some

10   compliance for them, the many states that we are

11   in.  We will work with HR advisors and

12   representatives to talk to them about those

13   compliance changes that are taking place, and then

14   it's, really that's the extent of it.

15           Q.   Okay.  Have you played that role at all

16   in the past three years?

17           A.   Yes.

18           Q.   Can you tell us what policies you

19   worked on?

20           A.   We have worked on policies related to

21   promotions, demotions, laterals, store start rate

22   changes.  We've worked on compliance policies for

23   different consent forms that are needed at the time

24   of hire.  Consent forms needed for various reasons

25   within the different states, those types of

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

 1    policies.

 2           Q.   Okay.  Have you done that at all,

 3    compliance regarding consent from the, have you

 4    worked on the compliance regarding consent forms in

 5    the State of Illinois?

 6           A.   Yes.

 7           Q.   Okay.  What was that consent form

 8    related to?

 9           A.   That consent form was related to the

10    finger scan device that we used.

11           Q.   Okay.  Are you talking about the

12    timekeeping device that Speedway uses?

13           A.   That is correct.

14           Q.   And what role did you play in preparing

15    the consent forms for that topic?

16           A.   Really just working with HR

17    representation in Illinois and our attorneys to

18    look at the current policies that Speedway had in

19    place and make sure that we were remaining in

20    compliance and really more so providing a little

21    more expertise on the actual process of the finger

22    scan.

23           Q.   Okay.  And when did you perform those

24    functions?

25           A.   We evaluated the compliance portion of

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    that in 2017.

2         Q.  Do you remember what time of the year

3    in 2017?

4         A.  Maybe around second to third quarter.

5         Q.  Do you remember what month of the year

6    it would have been?

7         A.  When we started evaluating the policy?

8         Q.  Yes.

9         A.  No, I don't know exactly what month

10   that was in.

11        Q.  How did you first learn that you were

12   going to evaluate the consent form policies for

13   Illinois workers regarding Speedway's finger scan

14   timekeeping device?

15        A.  There had been a news article related

16   to Kronos in particular that they were being looked

17   at for their finger scan devices, and that caused

18   our HR representatives and attorneys to come

19   together to just double check our compliance with

20   it.

21        Q.  Okay.  Do you remember who it was at

22   Speedway who identified that news article regarding

23   Kronos?

24        A.  I don't know who specifically noticed

25   the article.  I do know who was present in the

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   meeting.

2           Q.  Okay.  What meeting?

3           A.  To discuss the compliance and whether

4   we were where we needed to be.

5           Q.  Okay.  So the article would have been

6   before that meeting; is that correct?

7           A.  Yes.

8           Q.  Okay.  Was the article, did you ever

9   read the article?

10          A.  I did not read it verbatim.  I had kind

11  of hit some highlights on it.

12          Q.  Okay.  Do you know if the article was

13  for Kronos being sued for violations of the

14  Illinois Biometric Information Privacy Act?

15          A.  Yes.  That is correct.

16          Q.  So do you remember who shared that

17  article with you?

18          A.  I, nobody shared it with me.  I take it

19  upon myself if I hear of stuff like that to go and

20  search, so I'm sure I Googled it.

21          Q.  Okay.  Who first shared with you the

22  news that that article existed?

23          A.  That would have been our attorney.

24          Q.  Who was that?

25                  MR. WOLFE:  So I'm, I think

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    correctly.

2          Q.  Okay.  Were there any materials that

3    were prepared for the meeting?

4          A.  I don't believe so.

5          Q.  Prior to this meeting were you familiar

6    with BIPA?

7          A.  I was not.

8          Q.  Do you remember when you first learned

9    about BIPA?

10          A.  At this meeting.

11          Q.  Okay.  How was it you learned about

12    BIPA?

13          A.  At this meeting.

14          Q.  How is it you learned about BIPA at

15    this meeting?

16                MR. WOLFE:  I think if you can

17    answer that without getting into attorney/client

18    privilege communications, you can, but if you can't

19    then don't answer.  So, in other words, if Holly

20    told you about it, then I'm instructing you not to

21    answer.

22                THE WITNESS:  Okay.  Holly told me

23    about it.

24                MR. WOLFE:  So I think we stop

25    there.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1  meeting?

2         A.  No, not that I recall.

3         Q.  Okay.  Were there any follow up e-mails

4  sent of that meeting?

5         A.  I imagine so, but I don't know

6  specifically if there were.

7         Q.  Okay.  You're not sure?

8         A.  No, I'm not sure.

9         Q.  Okay.  After that meeting did you do

10  anything next to create or implement compliance

11  with consent forms?

12                MR. WOLFE:  Could you say that

13  again, Ryan?  We couldn't really hear you.

14  BY MR. STEPHAN:

15         Q.  Yeah.  I'll ask it a different way.

16  Did you take the actions after that meeting about,

17  regarding BIPA and its application in Illinois?

18         A.  Did I specifically take any action?

19         Q.  Yes.

20         A.  No.

21         Q.  Are you aware of anyone else at

22  Speedway taking a specific action?

23         A.  Yes.

24         Q.  Okay.  What are you aware of?

25         A.  We created a consent form.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    BY MR. STEPHAN:

2           Q.  No.  I just want to know when the next

3    conversation, not content of, just when the next --

4                 MR. WOLFE:  Thank you, Ryan.

5                 THE WITNESS:  Honestly, I don't

6    know specifically what the date was, but it would

7    have been sometime before November.

8    BY MR. STEPHAN:

9           Q.  Why do you say before November?

10          A.  Because we implemented the consent form

11   in November.

12          Q.  Do you know approximately how long

13   after that initial meeting that we discussed until

14   Holly created that consent form?

15          A.  A month or so.

16          Q.  Okay.  Do you know if anyone else

17   played a role in preparing the consent form?

18          A.  I mean, I don't know for sure, but I

19   would guess that Diana and her were creating it.

20          Q.  Can you think of anyone else that would

21   have helped prepare this consent form?

22          A.  IT may have had a role in that.

23          Q.  Would that have been either Chris

24   Salley or Ryan?

25          A.  Probably.

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1          Q.  Okay.  Can you think of anyone else who

2     would have had a role in preparing that consent

3     form?

4          A.  No.

5          Q.  Okay.  So I'm trying to get a

6     chronology here.  You were made aware of an article

7     about players against Kronos questions regarding

8     BIPA in Illinois, correct?

9          A.  Correct.

10          Q.  Shortly thereafter there was a meeting

11     that you testified about in the conference room

12     that Speedway's headquarters, correct?

13          A.  Correct.

14          Q.  And then within a month or so

15     thereafter Holly Hollandsworth with the assistance

16     of Diana Anderson prepared the --

17          A.  Can you repeat that?

18          Q.  Sure.  Within a month or so after that

19     meeting Holly Hollandsworth and Ms. Anderson

20     prepared the consent form?

21          A.  Yes.

22          Q.  And they shared that form with you via

23     e-mail, correct?

24          A.  Yes.

25          Q.  What is your current e-mail address?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1                    (WHEREUPON, a recess was taken.)

2    BY MR. STEPHAN:

3         Q.  We're back on the record.  When we took

4    a break we were talking about Speedway's rolling

5    out of this new BIPA consent form back in the fall

6    of 2017; do you recall that, Kelli?

7         A.  Yes.

8         Q.  And do you remember the date that it

9    was rolled out?

10        A.  I believe it was November 1st of 2017.

11        Q.  Okay.  And was Ms. Anderson responsible

12   for sort of overseeing the roll out to the store

13   employees in Illinois?

14        A.  Yes.

15        Q.  And I think you mentioned that it

16   applied for about 5 or 600 store employees at the

17   time; is that right?

18        A.  More or less.

19        Q.  Okay.  And they are all using

20   Speedway's timekeeping device at the time, correct?

21        A.  Yes.

22        Q.  And what type of device was it?

23        A.  It was a finger scan device.

24        Q.  Okay.  And do you know who the vendor

25   was that manufactured those devices?

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

1          A.   That was TimeLink.

2          Q.   Okay.   There's actually a company

3     called TimeLink, though, and TimeLink Software,

4     correct?

5          A.   Yes, at the time.

6          Q.   Do you know when Speedway first used

7     the TimeLink software?

8          A.   I believe that that was implemented

9     between 2003, 2004.

10         Q.   Does it still use it today?

11         A.   No.

12         Q.   When did it stop?

13         A.   Are you speaking specifically in the

14    State of Illinois?

15         Q.   Yes.

16         A.   2018.

17         Q.   Do you remember when in 2018?

18         A.   No, I don't because that was a phased

19    roll out in different divisions, went live at

20    different times throughout the year.

21         Q.   Okay.   So for the State of Illinois

22    would you agree that that software used for

23    timekeeping devices between 2003 or 2004 and then

24    2018 was TimeLink?

25         A.   Yes.

Electronically signed by Jamie Hurley (501-205-026-7923)          0398514a-fb93-424a-adab-0ac8606f2c22

1          Q.  Have we exhausted that basis?

2          A.  Yes.

3          Q.  Okay.  You also mentioned that another

4    basis of documentation, I think, from Kronos; is

5    that right?

6          A.  Yes.

7          Q.  What documentation are you referring

8    to?

9          A.  They have information, published

10   material about their specific software and hardware

11   devices that they use.

12         Q.  Can you think of the name of those

13   publications?

14         A.  No.

15         Q.  Do you remember when you first saw

16   those documents?

17         A.  No.

18         Q.  Okay.  Do you have any other basis for

19   your testimony that the timekeeping devices used by

20   Speedway don't take actual pictures of user's

21   fingerprints?

22         A.  No.

23         Q.  Okay.  You would agree, though, that at

24   least up until any changes that Kronos or, I'm

25   sorry, that Speedway made in 2018 that employees

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    would clock in and out by putting their finger on

2    the timekeeping device, correct?

3          A.  Yes.

4          Q.  And you would agree that before that

5    they could clock in and out they would have to be

6    enrolled in that timekeeping device, correct?

7          A.  Yes.

8          Q.  And to do so Speedway would collect

9    those user's fingerprints, correct?

10          A.  I would say that Speedway collected a

11    code that was assigned to a scan of match points of

12    an employee's finger.

13          Q.  Okay.  Let's break this down.  Have you

14    ever personally been involved in an enrollment of

15    an employee in Illinois into the timekeeping

16    device?

17          A.  No.

18          Q.  Do you have any personal knowledge

19    about how that occurs?

20          A.  Yes.

21          Q.  What is your personal knowledge?

22          A.  When an employee begins employment at

23    the store, the manager takes them to the clock.

24    The employee places their finger on the scanner.

25    That scanner immediately creates an alphanumeric

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1          Q.  Yeah.  Can they put the top of their
2    finger, like their fingertips?
3          A.  I believe they could.  I'm not sure if
4    it could assign a code to that.
5          Q.  Is that consistent with Speedway's
6    process of enrolling new employees that are
7    permitted the top of their finger on the scanner
8    when they are rolling their fingerprint in the
9    timekeeping device; is that permitted?
10          A.  If it allows the employee to have the
11    scan completed and the code created, then we would
12    allow it.
13          Q.  Does it?
14          A.  Not to my knowledge.
15          Q.  Okay.  So they are required to place
16    the pad of their finger, correct?
17          A.  Yes.
18          Q.  Or where their fingerprint is, right?
19          A.  The pad of their finger, yes.
20          Q.  Yeah.  Would you agree with me, I mean,
21    it's not rocket science, the pad of your finger to
22    yours, that's where your fingerprint is, correct?
23          A.  Sure.
24          Q.  Okay.  And that's the part of your
25    finger that Speedway required store employees in

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   Illinois to scan when they are enrolled in a their

2   timekeeping system, correct?

3           A.  Normally.

4           Q.  What do you mean normally?

5           A.  I know of occasions where there's been

6   other images with match points that were converted

7   to this code that was outside of the finger.

8           Q.  What do you mean?

9           A.  There was a specific case that I had

10  talked to my manager about where employees no

11  longer had said fingerprint or pad on their finger,

12  and so we would collect the scan of the palm, a

13  point on the palm that would create match points to

14  that that would be able to create a code.

15          Q.  Okay.  So would you agree that outside

16  of those circumstances where an employee either

17  doesn't have a fingerprint or there's some problem

18  with their fingerprint that prevented them from

19  using that to enroll themselves into the

20  timekeeping device Speedway would have them use

21  their hand instead; is that correct?

22          A.  Or manually.

23          Q.  What do you mean manually?

24          A.  Employees, if they did not want to

25  provide the scan or if they couldn't provide a scan

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   code was based on the employee's finger scan?

2       A.  Yes.

3       Q.  So before a code can be created, the

4   employee had to scan his or her finger on the

5   timekeeping device, correct?

6       A.  Yes.

7       Q.  And that code would then be used to

8   identify the users when they clock in and out on

9   Speedway's timekeeping device using their finger,

10  correct?

11      A.  Yes.

12      Q.  By the way, how long have the Kronos

13  devices been used by Speedway stores in Illinois?

14             MR. WOLFE:  Objection.  Asked and

15  answered.  You can answer it.

16             THE WITNESS:  The clocks have been

17  used since the original rollout in 2003, 2004.

18  BY MR. STEPHAN:

19      Q.  Have they always been Kronos time

20  clocks?

21             MR. WOLFE:  Objection, asked and

22  answered.  You can answer it again.

23             THE WITNESS:  Before Kronos bought

24  TimeLink, no, they were not.  They were not Kronos.

25  BY MR. STEPHAN:

Electronically signed by Jamie Hurley (501-205-026-7923)      0398514a-fb93-424a-adab-0ac8606f2c22

 1  BY MR. STEPHAN:

 2        Q.  Okay.  And that was true up until at

 3  least November of 2017, correct?

 4        A.  Yes.

 5        Q.  Okay.  And during that time from 2012

 6  until November of 2017 did Speedway get those

 7  employees' written consent before it enrolled them

 8  in the biometric timekeeping device?

 9                  MR. WOLFE:  Object to the extent

10  it seeks a legal conclusion.  You can answer it.

11                  THE WITNESS:  There were numerous

12  policies that employees signed off on regarding our

13  technology, but specifically for the timekeeping

14  device, no.

15  BY MR. STEPHAN:

16        Q.  Okay.  And prior to November of 2017

17  did Speedway inform any of its store employees of

18  their rights under BIPA?

19                  MR. WOLFE:  Same objection.  You

20  can answer it.

21                  THE WITNESS:  I am not sure.

22  BY MR. STEPHAN:

23        Q.  As you sit here today are you aware of

24  under, informing store employees of their rights

25  under BIPA before November of 2017?

Electronically signed by Jamie Hurley (501-205-026-7923)                           0398514a-fb93-424a-adab-0ac8606f2c22

1     A.  From a written perspective, no.  But
2  I'm not sure verbally.
3     Q.  Prior to November of 2017 are you aware
4  of Speedway having a written policy that was made
5  available to the public establishing a retention
6  schedule and guidelines for permanently destroying
7  biometric identifiers, biometric information?
8     A.  Speedway has a retention policy
9  regarding all timekeeping information.
10     Q.  Okay.  Do they have one regarding
11  people's fingerprints and how those fingerprints
12  were destroyed prior to November of 2017?
13     A.  Not specifically, but it was also not
14  excluded.
15     Q.  I'm sorry, it was also not?
16     A.  Excluded.
17     Q.  What policy are you referring to?
18     A.  Our records retention policy.
19     Q.  Is there a name for it?
20     A.  Timekeeping.
21     Q.  Where is that policy kept?
22     A.  It's in our operations manual available
23  for anyone to see.  It's also on our corporate
24  share drive.
25     Q.  Okay.  You say in the operation's

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   prepare for today's deposition?

2              MR. WOLFE:  You can answer that

3   generally.

4              THE WITNESS:  Policies.

5   BY MR. STEPHAN:

6        Q.  Anything else?

7        A.  Declarations.

8        Q.  Anything else?

9        A.  No.

10        Q.  What policies did you review?

11        A.  The code of conduct, the code of

12   business conduct, sorry, the personal and

13   employment information policy, the retention

14   policy, the information release policy and the

15   information system usage policy.

16        Q.  Okay.  Did you look at any other

17   policies?

18        A.  The BIPA policy that was created in

19   2017.

20        Q.  Okay.  Anything else?

21        A.  No.

22        Q.  Okay.  You also mentioned you looked at

23   declarations?

24        A.  Yes.

25        Q.  Whose declarations?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    Q.  Okay.

2    A.  Or policy.

3    Q.  Is this a form --

4    A.  The BIPA policy.

5    Q.  Sure.  Is this a form that's prepared

6  by Holly and Diana?

7    A.  Yes.

8    Q.  Okay.  And this is a form that would

9  have been rolled out on November 1st, 2017?

10   A.  Yes.

11   Q.  Okay.  Do you see at the top of it it

12  says, to all Illinois stores?

13   A.  Yes.

14   Q.  And this was actually rolled out to

15  over 100 stores in Illinois, correct?

16   A.  Yes.

17   Q.  By the way, have you ever read the

18  Illinois Biometric Information Privacy Act?

19   A.  No.

20   Q.  Do you know who if Diana or Holly had

21  approval from anyone else before they finalized the

22  policy?

23   A.  I'm sorry, can you repeat that.

24   Q.  Do you know if Holly Hollandsworth or

25  Diana Anderson needed to get approval from anyone

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1          A.   Honestly I'm not for sure, maybe at the

2     end of 2017.

3          Q.   Are you aware that Mr. Howe filed this

4     lawsuit on February 1st, 2017?

5          A.   No, I'm not aware.

6          Q.   You would agree that would be two

7     months before this consent form was rolled out?

8          A.   Yes.

9          Q.   Prior to rolling this consent form out

10    in November of 2017, did you have any knowledge

11    that a lawsuit was filed against Speedway for

12    violations of BIPA?

13         A.   No.

14         Q.   Do you remember how you first learned

15    about this lawsuit that brought you here today?

16         A.   I don't remember the specifics of the

17    conversation, but it was brought to my attention by

18    our attorney.

19         Q.   That would be Holly?

20         A.   That would be Holly, yes.

21         Q.   Was that face-to-face conversation?

22         A.   I don't recall.

23         Q.   In that first sentence it talks about

24    third party device; do you see that that, that

25    first bullet point?

Electronically signed by Jamie Hurley (501-205-026-7923)                                    0398514a-fb93-424a-adab-0ac8606f2c22

1    recall his name.

2          Q.  When was the last time you communicated

3    with Kostas?

4          A.  That would have probably been that

5    conversation that we had when he was onsite at

6    Speedway which was several years ago.

7          Q.  When was the last time you communicated

8    with the --

9          A.  That would have been after the

10   evaluation of time systems for the future, so 2017.

11         Q.  And who, was the rep a man or a woman?

12         A.  It was a man.

13         Q.  You don't remember his name?

14         A.  Honestly, I really don't, I'm sorry.

15         Q.  Would you agree that if we really want

16   to find out whether or not the original fingerprint

17   was to be recreated we should ask Kronos?

18         A.  Yeah.

19         Q.  Are you aware of any efforts by anyone

20   at Speedway to contest that statement?

21         A.  No, I'm not aware of that.

22         Q.  Okay.  And then do you see the next

23   section it talks about effective immediately?

24         A.  Yes.

25         Q.  So after November 1st, 2017 would you

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    agree it was Speedway's policy to require all

2    employees including store leadership hired on or

3    after November 2nd, 2007 to require them to

4    acknowledge and sign information release form

5    during the onboarding process?

6           A.  Yes.

7           Q.  Current employees who are already

8    enrolled who previously enrolled before November

9    1st, 2017 were also required to sign off on this

10   consent form, right?

11          A.  It does not specifically say in this

12   document they were required to sign it, but that,

13   they would need to acknowledge and sign to continue

14   to use it.

15          Q.  Right.  It doesn't use the word

16   require.  It says they need to acknowledge and sign

17   the release, correct?

18          A.  Correct.

19          Q.  It then goes on at the bottom it says,

20   if you have any questions, please dial the

21   Operations One Number; do you see that?

22          A.  Yes.

23          Q.  What is Operations One?

24          A.  The Operations One Number is one number

25   that all employees have access to for different

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    in compliance.

2         Q.  When you say security, store security,

3    data security, what kind of security?

4         A.  That would be more like store security,

5    employee security.

6         Q.  Have you had any discussions with Scott

7    about this case?

8         A.  No.

9         Q.  Have you had any discussions with Scott

10   about the consent forms that were rolled out in

11   November of 2017?

12        A.  No.

13        Q.  And have you had any discussions with

14   Scott at all about the timekeeping devices in this

15   case?

16        A.  No.

17        Q.  Okay.  If we continue on, actually if

18   we look before that, that is dated August 2nd,

19   correct?

20        A.  Correct.

21        Q.  If we go to the last page of this

22   document ending in 7444?

23        A.  Okay.

24        Q.  Do you see there's an August 1st, 2017

25   e-mail from Kevin Majewski; do you see that?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    on special projects that are specific to stores.

2    They handle communication to stores, that kind of

3    thing.

4         Q.  Okay.  Is she still with Speedway?

5         A.  She is still with Speedway.

6         Q.  Okay.  Is this how you first learned

7    about this biometric lawsuit against Kronos?

8         A.  Yes, this would be it.

9         Q.  Okay.  So you learned about it from

10   Kevin, not Holly; is that right?

11        A.  Yeah.

12        Q.  Do you know why Kevin is inquiring

13   about biometric clocks?

14        A.  Yes, I do.

15        Q.  Why is that?

16        A.  Because at this time we were doing our

17   analysis of time systems to decide on the future

18   and what we were going go with, and so we were

19   looking at whether or not we needed to look outside

20   of the biometric devices.

21        Q.  Okay.  Was he overseeing that process?

22        A.  From an operations perspective at the

23   time, he was, he was overseeing that.

24        Q.  Remind me again what was his position?

25        A.  He was the program manager for ops

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1   at least as of November 2017 with BIPA?

2          A.  I mean, it was my understanding that we

3   were already in compliance.  It was just a tool to

4   strengthen it.

5          Q.  Well, what was done to ensure

6   compliance before November of 2017?

7          A.  We keep our data secured.  We have

8   numerous policies addressing the privacy of

9   employee data and how we do not transmit that to

10   third party vendors, employees consent to

11   understanding that we treat our employee data and

12   customer data very, very securely.

13          Q.  Okay.  Are you aware of anything else

14   that was done by anyone at Speedway to ensure

15   compliance with BIPA prior to November of 2017?

16          A.  Not specific to BIPA.

17          Q.  And when you say that data was secured,

18   what data are you referring to?

19          A.  Any kind of personal information data.

20          Q.  Okay.  That would include biometric

21   data, correct?

22          A.  That would include the code that was

23   assigned to the employee.

24          Q.  Okay.  That would include the data that

25   was collected by Speedway's time clocks, correct?

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1        A.  Yes.

2        Q.  You also mentioned that there were

3   numerous policies that showed compliance, correct?

4        A.  Yes.

5        Q.  What policies are those?

6        A.  That would be like our code of conduct,

7   code of business conduct policy, our information

8   release policy, our personal and employment

9   information policy, retention policies, those types

10  of documents.

11       Q.  Did any of those policies you just

12  mentioned reference BIPA?

13       A.  Not specific.

14       Q.  Did any of those reference biometric

15  information systems?

16       A.  Not specifically.

17       Q.  Did any of those reference fingerprints

18  collected for purposes of timekeeping?

19       A.  Not specifically.

20       Q.  Okay.  The last thing I think you

21  mentioned was employee's consent, give consent; is

22  that right?

23       A.  Employee consent to understanding

24  Speedway's policy on information, yes.

25       Q.  So you're talking about general

Electronically signed by Jamie Hurley (501-205-026-7923)                    0398514a-fb93-424a-adab-0ac8606f2c22

1    consent, correct?

2         A.  For the code of business conduct.

3         Q.  Okay.  Did they have to sign off on the

4    code of business conduct?

5         A.  Yes.

6         Q.  Okay.  And that code of business

7    conduct, correct me if I'm wrong, doesn't say

8    anything about BIPA, correct?

9         A.  Not specifically.

10        Q.  It doesn't say anything about

11   biometric, does it?

12        A.  Not specifically.

13        Q.  So the only consent that says anything

14   about fingerprints or biometric information, BIPA

15   is the one that was rolled out in November of 2017,

16   correct?

17        A.  Yes.

18        Q.  Do you know who Hannah Rice is?

19        A.  Hannah Rice, I have heard the name.  I

20   believe she was a district manager trainee a long

21   time ago.

22        Q.  Do you know if she's a communication

23   supervisor?

24        A.  She, you know now that you mention it,

25   she was a communication supervisor for a very, very

Electronically signed by Jamie Hurley (501-205-026-7923)                          0398514a-fb93-424a-adab-0ac8606f2c22

1  written interrogatories in this case?

2      A.  I'm not sure what that is.

3      Q.  Sure.  Did you play any role in

4  answering questions directed to Speedway related to

5  this lawsuit?

6      A.  I don't recall.

7      Q.  Okay.  Did Speedway, do you know if

8  Speedway received any sort of written consent from

9  Mr. Howe prior to Speedway collecting history?

10     A.  We received his consent, we would have

11 received his consent on the code of business

12 conduct.

13     Q.  Okay.  Did, are you aware if Speedway

14 received his consent in any way regarding BIPA or

15 collection of his biometric information?

16     A.  No, I do not recall.

17     Q.  You don't recall or you don't know?

18     A.  I'm not, I'm not sure when Mr. Howe was

19 an employee at Speedway, so I don't know if we've

20 received his consent.

21     Q.  Okay.  As you sit here today, you're

22 not aware of Speedway receiving his consent; is

23 that right?

24     A.  Correct.

25              MR. STEPHEN:  That's all the

Electronically signed by Jamie Hurley (501-205-026-7923)   0398514a-fb93-424a-adab-0ac8606f2c22