# EXHIBIT 4

1           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    CHRISTOPHER HOWE,              )
     individually, and on behalf   )
4    of all others similarly       )
     situated,                     )
5                                  )
                 Plaintiffs,       )
6                                  )
           vs.                     )   No. 1:19-cv-01374
7                                  )
     SPEEDWAY, LLC and MARATHON     )
8    PETROLEUM COMPANY,            )
                                   )
9                Defendants.       )

10

11           THE DEPOSITION OF NICOLE KARLSON, called

12   for examination pursuant to the Rules of Civil

13   Procedure for the United States District Courts

14   pertaining to the taking of depositions, taken before

15   Nohemi Salazar Pitts, Certified Shorthand Reporter for

16   the State of Illinois, on March 12, 2020, at the

17   Offices of StephanZouras, LLP, 100 North Riverside

18   Plaza, Suite 2150, Chicago, Illinois, commencing at

19   10:30 a.m.

20

21

22

23

24

1          (Whereupon, the witness was

2          administered an oath.)

3          NICOLE KARLSON,

4  called as a witness herein, having been first

5  administered an oath, was examined and testified as

6  follows:

7          EXAMINATION

8  BY MR. FICZKO:

9      Q.      Good morning.

10     A.      Good morning.

11     Q.      If you could please state and spell your

12  full name for the record.

13     A.      Nicole Karlson, N-I-C-O-L-E K-A-R-L-S-O-N.

14     Q.      Do you mind if I call you "Nicole" today?

15     A.      That's fine.

16     Q.      Nicole, have you ever sat for a deposition

17  before?

18     A.      Not been the person, but I have sat in on

19  one.

20     Q.      Sat in on one?  Okay.

21          So you may be familiar with the process,

22  but what I want to do first is just go over some ground

23  rules.  As you can see, there's a court reporter here.

24  She can only take down verbal responses.  So if you

1  e-mails?

2      A.    Just the communication that went out to the

3  stores about the onboarding process.

4      Q.    Okay.  And did your attorneys provide you

5  with those documents?

6      A.    Yes.

7      Q.    Anything else that you haven't already

8  indicated that you did in preparation for today's

9  deposition?

10     A.    No.

11     Q.    Nicole, are you currently employed?

12     A.    With Speedway, yes.

13     Q.    And you answered my next question, "With

14  whom."

15           And how long have you been employed with

16  Speedway?

17     A.    This is my 13th year.

18     Q.    13th year?  So 2007?

19     A.    Correct.

20     Q.    Have you worked continuously for Speedway

21  from 2007 to the present time?

22     A.    Yes.

23     Q.    Can you tell us what Speedway's primary

24  business is?

9

1    Q.    And in 2010, what position were you?

2    A.    I became a recruiter.

3    Q.    Recruiter for Speedway?

4    A.    Correct.

5    Q.    And how long did you hold that position?

6    A.    About a year, maybe a year and a half.

7    Q.    Okay.  So maybe 2011, 2012, something like

8    that?

9    A.    (Nonverbal response.)

10    Q.    And in 2011, 2012, what position did you

11    hold?

12    A.    I became a marketing coordinator.

13    Q.    And how long did you hold that position?

14    A.    I believe that was slightly less than

15    one year.

16    Q.    So 2013-ish, something like that?

17    A.    Something like that.

18    Q.    And then in 2013?

19    A.    "-ish," I became an HR advisor.

20    Q.    And is that your current position or did

21    you work in a different position?

22    A.    This is my current position.

23    Q.    So 2013 to the present, your current title

24    is HR advisor?

1    2013-ish.

2         Q.    Okay.  Sure.  And, Nicole, do you have a

3    LinkedIn page?

4         A.    I do.

5         Q.    And is the information noted on your

6    LinkedIn page accurate?

7         A.    Yes.

8         Q.    Do you know who drafted the information

9    noted on your LinkedIn page?

10        A.    The employment information?

11        Q.    Yes.

12        A.    Me.

13        Q.    And do you know when it was last updated?

14        A.    I do not.

15        Q.    You note some job duties under -- well,

16   strike that.

17             Is advanced senior resources advisor the

18   same thing as human resources advisor as you indicated?

19        A.    It is.

20        Q.    And then some of the job duties that you

21   list includes:  Guides and counsels field management in

22   areas of human resources, included but not limited to,

23   recruitment, employment practices, employee

24   performance, employment laws and regulations,

 1   compensation benefits, workers' compensation, and other

 2   company policies and practices.

 3          Is that an accurate statement?

 4     A.    Yes.

 5     Q.    And then you also indicate that you receive

 6   employee relations complaints, you research and conduct

 7   necessary investigations, and you make recommendations

 8   to resolve the problem based on the facts of the

 9   investigation?

10     A.    Correct.

11     Q.    Is that an accurate statement?

12     A.    Yes.

13     Q.    Those are both accurate statements as far

14   as the duties that you do currently as an advanced

15   human resources advisor, correct?

16     A.    Correct.

17     Q.    And when you were a store manager from

18   August 2007 until approximately either 2010 or 2012,

19   did your duties include serving as a leader and

20   overseeing the retail operation of a specific store?

21     A.    Yes.

22     Q.    And did you also ensure that the store

23   operates efficiently and in compliance with applicable

24   federal, state, and local laws, and company policies?

1  to review the information and electronically sign off

2  that they're aware of the policies.

3      Q.      And, do you know, these finger scan devices,

4  are they used to keep track of employees' time?

5      A.      Yes, they monitor their punches.

6      Q.      Did you play any role in preparing the

7  consent forms for that topic?

8      A.      I did not.

9      Q.      Did you play any role in rolling out the

10 consent forms regarding the timekeeping devices in

11 Illinois stores?

12     A.      I did not.

13     Q.      Are you aware of an article regarding

14 Kronos Corporation being sued for violations of the

15 Illinois Biometric Information Privacy Act?

16     A.      I am not.

17     Q.      Are you aware of any meetings that took

18 place in 2007 at Speedway regarding Illinois' Biometric

19 Privacy Act?

20     A.      I am not.

21     Q.      Are you familiar with the Illinois

22 Information Privacy Act?

23     A.      I am.

24     Q.      And when did you first learn about Illinois

1   Biometric Information Privacy Act?  If I call it BIPA,

2   can we agree --

3          A.    Yes.

4          Q.    Okay.  Thank you.

5          A.    When it first rolled out in 2017 to our

6   company.

7          Q.    And when you say "when it first rolled

8   out," what is "it" that you are referring to?

9          A.    I'm sorry.  When we received the Act via

10  information from our offices.

11         Q.    And who did you receive that information

12  from?

13         A.    It's a general distribution communications

14  center that sent it out.  It's not a person.

15         Q.    Is there a name for that general

16  distribution center?

17         A.    Not that I know of.  There's a variety of

18  communication centers.

19         Q.    And what information was relayed to you and

20  the rest of Speedway?

21         A.    That the policies were -- or, I'm sorry,

22  that the procedures would be changing in terms of

23  onboarding for new hires, that there would be new pages

24  electronically listed in the processes.

23

1  not.

2  Q.     Okay.  Did Speedway take any additional

3  measures as a result of this 2017 e-mail that you

4  received?

5  A.     Can you elaborate, I guess --

6  Q.     Sure.  Were there -- in addition to the one

7  form that they included on the onboarding process, did

8  Speedway take any additional measures in an effort to

9  comply with BIPA?

10  A.     We collected consent from current employees.

11  Q.     Anything else?

12  A.     Not to my knowledge.

13  Q.     Okay.  You indicated that you -- or, excuse

14  me, Speedway, secured consents from current employees;

15  is that what you indicated?

16  A.     Written consents.

17  Q.     Is the consent form this additional form

18  that was being added on to the onboarding process?

19  A.     I don't recall.

20  Q.     Was there a consent form that individuals

21  needed to sign prior to 2017 regarding BIPA?

22  A.     Prior to that, it was general policies

23  relating to privacy and confidentiality during --

24  Q.     But was -- I'm sorry.

1      A.    During the onboarding program.

2      Q.    Sure.  But was there an actual written

3 consent form that was required to be signed?

4      A.    Not relating specifically to BIPA.

5      Q.    Okay.  Was there a consent form relating to

6 something else that they needed to sign on --

7      A.    The general privacy and confidentiality

8 policies.

9      Q.    Okay.

10      A.    And that would have been electronic.

11      Q.    And you indicated that current employees

12 needed to now sign this form, correct?

13      A.    The BIPA, specifically.

14      Q.    And would new hires also now need to sign

15 this consent form, BIPA consent form?

16      A.    That is now part of the onboarding process.

17 So all new hires would go through that during their

18 hire.

19      Q.    Got you.  Do you know who was responsible

20 for overseeing the rollout process?

21      A.    I do not.

22      Q.    And you may have answered this, but did you

23 have any involvement in the rollout process?

24      A.    I didn't.

27

1    Q.    You indicated now, as of 2017, that

2   Speedway began circulating a consent form for Illinois

3   employees to sign, correct, a BIPA consent form?

4    A.    Yes.

5    Q.    Can you please explain this onboarding

6   process.

7    A.    Honestly, I have not done it myself, but

8   it's an electronic page that is done when they're doing

9   all of their new hire paperwork.

10    Q.    When you were a manager, would you have to

11   participate in this onboarding process with new hires?

12    A.    When I was a manager, no.

13    Q.    Was there a specific name for the

14   onboarding system?

15    A.    Now, or then?

16    Q.    Let's start with now.

17    A.    Now it's Cadient, C-A-D-I-E-N-T.

18    Q.    Did it have another name before?

19    A.    Kronos.

20    Q.    Would that be the Kronos Workforce

21   Management?

22    A.    I'm not sure.

23    Q.    Okay.  Something Kronos?

24    A.    (Nonverbal response.)

1    only hourly paid employees who were in the time systems

2    at Speedway?

3         A.    All employees.

4         Q.    Did you need to sign the consent form?

5         A.    I did not.

6         Q.    How come?

7         A.    I'm not an hourly employee for Illinois.

8         Q.    But the consent form was rolled out to

9    non-hourly paid employees as well?

10        A.    Store managers are not hourly, they're

11   exempt, so they were part of the process.

12        Q.    Would the store manager still need to sign

13   off on it?

14        A.    At that time, yes.

15        Q.    What time are you referring to?

16        A.    Prior to the BIPA forms being loaded on to

17   the new hire process.  Managers would not have been new

18   hires.

19        Q.    And then once it was rolled out in 2017,

20   current managers, would they need to sign off on it?

21        A.    I'm unclear on your question.

22        Q.    Sure.  In 2017 when the BIPA consent forms

23   were being rolled out, current managers, were they

24   required to sign off on it?

1      A.      Yes.

2      Q.      Okay.  And you kind of got into this, but

3  what positions in the state of Illinois were not

4  required to sign off on the BIPA consent form once it

5  was rolled out in 2017?

6      A.      Support positions, to my knowledge, did not

7  sign off.

8      Q.      Okay.  And you consider yourself in a

9  support position?

10      A.      Correct.

11      Q.      Do you know what type of timekeeping

12  devices are currently used at Speedway in Illinois?

13      A.      I do not.

14      Q.      Were timekeeping devices used at Speedway

15  when you worked as a store manager in 2007?

16      A.      Yes.

17      Q.      Do you know the type of devices that were

18  being used?

19      A.      I do not.

20      Q.      Do you know the software that was being

21  used for these timekeeping devices?

22      A.      TimeLink at the time that I was a manager.

23      Q.      Do you know if it's TimeLink now?

24      A.      I don't know.

31

1    the onboarding process?

2         A.    It has all the steps in place so that we

3    could hire a new employee.

4         Q.    Do you know if Speedway currently uses

5    timekeeping devices provided by Kronos?

6         A.    I don't know.

7         Q.    Do you know when Speedway first started

8    using TimeLink?

9         A.    I do not know.

10        Q.    Are you familiar with a Touch ID device?

11        A.    Not to my knowledge.

12        Q.    Would you agree that employees working at

13   Speedway stores in Illinois back in 2017, at the time

14   that the BIPA consent forms were being rolled out, that

15   they were required to clock in and clock out of these

16   timekeeping devices with their finger?

17        A.    Yes.

18        Q.    Do you know if the BIPA consent form that

19   was being rolled out in 2017 used the word

20   "fingerprint" in it?

21        A.    I do not know.

22        Q.    If the consent form did include the word

23   "fingerprint," would there be any issue with that, as

24   far as you are concerned?

1      Q.      What is your basis for your understanding
2   that the timekeeping devices only scanned the shape of
3   the finger?
4      A.      So in the information that was provided so
5   that we could educate employees if they had questions.
6      Q.      And what information are you referring to?
7      A.      In regards to the BIPA act.
8      Q.      So the basis of your knowledge that the
9   timekeeping devices only scanned the shape of the
10  finger is based on the information that was circulated
11  in 2017 regarding BIPA that we have been discussing
12  today?
13     A.      Correct.
14     Q.      Would you agree that at least up to the
15  time that Speedway rolled out the BIPA consent forms in
16  2017, that employees in Illinois would clock in and
17  clock out by putting their finger on the timekeeping
18  device?
19     A.      Can you re-ask the question?
20     Q.      Sure.  You want me to re-ask it; is that
21  what you're saying?
22     A.      Yes, please.
23     Q.      Would you agree that at least up until the
24  time that Speedway rolled out its BIPA consent form in

1   2017, that employees in Illinois would clock in and

2   clock out by putting their finger on the timekeeping

3   device?

4        A.    Yes.

5        Q.    And would you agree that after Speedway

6   rolled out the BIPA consent form in 2017, that

7   employees in Illinois would clock in and clock out by

8   putting their finger on the timekeeping device?

9        A.    Yes.

10       Q.    And would you agree that before they could

11  clock in and clock out, that a Speedway employee would

12  need to be enrolled in a timekeeping device?

13       A.    Yes.

14       Q.    And that was the case prior to the rollout

15  in 2017 of the BIPA consent form, correct?

16       A.    Yes.

17       Q.    And that was also the case after the 2017

18  rollout of the BIPA consent form, correct?

19       A.    Yes.

20       Q.    I believe you may have already answered

21  this.  Have you personally been involved in the

22  enrollment of an employee in Illinois into a

23  timekeeping device?

24       A.    No.

1      Q.     Even as a manager, correct?

2      A.     Not in Illinois.

3      Q.     Not in Illinois?  Okay.

4      Were you involved in the rollout process in

5 a different state?

6      A.     Indiana.

7      MR. WOLFE:  Do you mean enrollment?  You

8 said "rollout"?

9      MR. FICZKO:  Oh.  Enrollment.

10 BY MR. FICZKO:

11     Q.     Sorry.  Enrollment.

12     A.     Yes, enrollment in Indiana.

13     Q.     Do you have personal knowledge how that

14 occurs?

15     A.     I do.

16     Q.     And what is your knowledge?

17     A.     As a manager, I would enter in an

18 employee's ID, or the employee could enter in their own

19 ID, and then the employee scans -- does the finger scan

20 to enroll themselves in the time clock.

21     Q.     Do you know, is that consistent with the

22 enrollment process in Illinois?

23     A.     At this time?

24     Q.     Yes.

1       A.     I'm not sure.

2       Q.     Do you have any reason to believe that it

3 is not consistent with the enrollment process in

4 Illinois?

5       A.     Not to my knowledge.

6       Q.     And was that consistent with the enrollment

7 process prior to 2017 before the BIPA consent forms

8 were circulated?

9       A.     To my knowledge.

10      Q.     Where on the device would an employee who

11 wants to be enrolled in the device place their finger?

12      A.     There's a finger pad that they would put

13 their finger on.

14      Q.     Is there any scanner that is part of this

15 timekeeping device?

16      A.     I have not used the new scanners, so I'm

17 not sure.

18      Q.     What new scanners are you referring to?

19      A.     They're not the same as when I was a store

20 manager.

21      Q.     And when you were a store manager, they

22 were TimeLink, correct?

23      A.     Yes.

24      Q.     Do you know when these new timekeeping

1     Q.    And where did you obtain that knowledge as

2 far as what part of the finger an employee should put

3 on the timekeeping device in order to enroll?

4     A.    What I did on my own.

5     Q.    And what do you mean what you did on your

6 own?

7     A.    When I was hired into the company and I

8 myself logged myself in, in the space provided, common

9 sense says you put your finger on the pad.

10     Q.    You weren't provided any instructions as

11 far as when to enroll --

12     A.    Not to my recollection, no.

13     Q.    Did anyone from TimeLink instruct you on

14 how to enroll an individual?

15     A.    No.

16     Q.    Could employees in Illinois refuse to use

17 their finger to clock in and out each day?

18     A.    I never had it come up.

19     Q.    When you were working as a manager in

20 Indiana, could an employee refuse to use their finger

21 to clock in and out?

22     A.    Similar, I never had it come up.

23     Q.    So when you were a manager, all of the

24 employees that you supervised used their finger to

42

1    clock in and out?

2         A.    They did.

3         Q.    Do you know, are new employees now able to

4    refuse to use their finger to clock in and out?

5         A.    Not to my knowledge.

6         Q.    So they're required to use their finger now

7    to clock in and out?

8         A.    Yes.

9         Q.    Do you know, today, currently, are all

10   timekeeping devices the same in all stores in Illinois?

11        A.    I do not know.

12        Q.    If you wanted to find that answer out, who

13   can you ask?

14        A.    I don't know.

15        Q.    Are there any documents that you could look

16   at?

17        A.    Not to my knowledge.

18        Q.    Are you familiar with Infor?

19        A.    No.

20        Q.    Since you have been working at Speedway,

21   has Speedway always had at least one timekeeping device

22   per store?

23        A.    To my knowledge.

24        Q.    Prior to the BIPA consent form being rolled

1   out in 2017, did Speedway get Illinois employees'

2   written consent before enrolling them in the time clock

3   devices?

4       A.    Not to my knowledge.

5       Q.    And prior to the rollout of the BIPA

6   consent forms in 2017, did Speedway inform any of its

7   Illinois store employees of their rights under BIPA?

8       A.    We would have general privacy and

9   confidentiality policies that they would have had

10   access to.

11       Q.    But as far as specifically related to BIPA,

12   prior to 2017, did Speedway inform its employees of

13   their rights under BIPA?

14       A.    Not under BIPA, to my knowledge.

15       Q.    Are you aware of Speedway having a written

16   policy that was made available to the public

17   establishing its retention schedule and destruction

18   guidelines for destroying biometric identifiers and/or

19   biometric information?

20       A.    Not to my knowledge.

21       MR. FICZKO:  Take a two-minute break?

22       MR. WOLFE:  Let's take five minutes.

23           (Whereupon, a short break was

24           taken.)

1    A.    Yes.

2    Q.    And you see where it says, ██ ██ ██

3  ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██

4  ██ ██ ██ ██ ██ ██ ██

5    A.    Yes.

6    Q.    That one would also include employees in

7  Illinois, correct?

8    A.    I don't have any knowledge of it.

9    Q.    Any reason to believe that this would not

10  apply to employees in Illinois?

11    A.    No.

12    Q.    ██ ██ ██ ██ ██ ██ ██ ██

13  ██ ██ ██ ██ ██ ██ ██ ██

14  ██ ██ ██ ██ ██

15        Do you see that?

16    A.    I do.

17    Q.    ██ ██ ██ ██ ██ ██ ██ ██

18  ██ ██ ██ ██ ██ ██ ██

19    A.    I do.

20    Q.    ██ ██ ██ ██ ██ ██ ██

21  ██ ██ ██ ██ ██ ██ ██ ██

22  ██ ██ ██ ██ ██ ██ ██ ██

23  ██ ██ ██

24    A.    No.

1     A. ▄▄▄▄ ▄▄▄▄ ▄▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄▄

2     Q. And the pad is where the fingerprint is

3 located, correct?

4     A. Yes.

5     Q. ▄▄▄▄ ▄▄▄▄ ▄▄▄▄ ▄ ▄▄▄▄▄▄ ▄▄▄▄

6     A. Sure.

7     Q. ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄▄ ▄▄▄ ▄▄ ▄▄▄ ▄▄▄▄

8 ▄▄▄▄▄▄▄ ▄▄▄ ▄▄▄ ▄▄ ▄▄▄

9     A. Yes.

10    Q. ▄▄▄ ▄▄▄▄ ▄▄▄ ▄▄▄ ▄▄ ▄▄ ▄▄ ▄▄▄

11 ▄▄▄▄ ▄▄▄ ▄▄ ▄▄▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄▄

12    A. Yes.

13    Q. ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄ ▄▄▄

14 ▄▄▄▄▄ ▄▄▄▄ ▄▄▄▄ ▄▄▄ ▄▄ ▄▄▄▄ ▄▄▄

15 ▄▄▄ ▄▄▄ ▄▄ ▄▄▄▄ ▄▄▄

16    A. Yes.

17    Q. ▄▄▄ ▄▄ ▄▄ ▄▄▄▄ ▄▄▄ ▄▄ ▄▄▄

18    A. I'm not sure.

19    Q. Based on your reading of that, what is your

20 answer?

21    A. ▄▄▄ ▄▄▄ ▄▄▄ ▄▄ ▄▄ ▄▄▄ ▄▄ ▄▄ ▄▄▄ ▄▄▄▄

22    Q. ▄▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄▄

23 ▄▄▄▄ ▄▄ ▄▄▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄▄

24 ▄▄▄▄ ▄▄▄ ▄▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄ ▄▄▄

VerbalTech Inc. – 312.869.4039
Chicago, Illinois

1 ████ ██ ██████ ██ ██ ██ ██ ██████ ██ ███████

2 ██ ██ ███████ ████

3     A.     Yes.

4     Q.     Do you know if that's how the device

5 actually works?

6     A.     I do not know.

7     Q.     █████ ██ ██ ██ ██████ ██ ██ ██

8 ████ ██ ██ ████ ██ ██ ██ ████ ██ ██ █████

9 ██████

10     A.     Yes.

11     Q.     █████ ██ ██ ██ ██ ████ ██ ██ ██████

12 ████ ██ ██ ████ ██ ████ ██ ██ ██ ██ ██ █████

13 ████ ██ ██ ████ ██ ████ ████ █████ ██████

14 ██ ██ ██ ████

15     A.     I do.

16     Q.     █████ ██ ██ ██ ████ ██ █████ ██ ██

17 ██████ ███████

18     A.     I do not.

19     Q.     As you sit here today, what's your

20 definition of "biometric"?

21     A.     I don't know.  I have only used it in this

22 context.

23     Q.     And what do you mean in this context?

24     A.     For the BIPA information.

67

1      Q.      Are you aware of anyone at Speedway making

2  any efforts to contest that statement?

3      A.      No.

4      Q.      ███ ████ ████ ████ ████ ███ ██ ███

5  ███ ████ ████ ██████ ██████ ██ ███ ████

6      A.      I do.

7      Q.      So after November 1, 2017, would you agree

8  that it was Speedway's policy to require all employees,

9  including store leadership, hired on or after

10 November 2nd, to acknowledge and sign the information

11 release form during the onboarding process?

12     A.      Yes.

13     Q.      And current employees who are already

14 enrolled before November 1st, 2017, were they also

15 required to sign off on the BIPA consent form?

16     A.      Yes.

17     Q.      ███ ███ ████ ████ ████ ████ ██ ███

18 ███ ███ ██ ████ ███ ████ ████ ████ ██ ████

19 ███ █████

20     A.      Yes.

21     Q.      ████ ███ ████ ████ ███ ████ ████ ████

22 ███ ████ █████ █████ █████ █████ █████

23     A.      Yes.

24     Q.      And are you familiar with this policy?